# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

SAMIHA CARROLL, an individual,

Appellant,

v.

RENTON SCHOOL DISTRICT, a
Washington municipal corporation,

Respondent.

No. 81411-7-I

DIVISION ONE

UNPUBLISHED OPINION

APPELWICK, J. — Carroll appeals from dismissal on summary judgment of her claims under the Washington Law Against Discrimination[1] against her former employer. She argues numerous issues of material fact exist. Further, she argues the court erred by failing to consider that historical, institutional, implicit, and intersectional biases should inform the court's evaluation of whether discriminatory intent was behind an adverse employment action. We affirm.

## FACTS

### Employment Facts

In June 2017, Samiha Carroll was hired to work for the Renton School District (District) as the Lakeridge Elementary School (Lakeridge) assistant principal. Carroll is an African-American woman, and was six months pregnant at the time she was hired. Holly Thompson, principal at Lakeridge, served on the committee that conducted interviews of applicants for the assistant principal

---

[1] Ch. 49.60 RCW.

position. Neither the District nor the hiring committee knew that Carroll was pregnant at the time it hired her.

On July 3, 2017, Carroll began her role as assistant principal. However, she was asked by Thompson to take a week of vacation her first week because Thompson would also be on vacation. Thompson was on vacation for three or four weeks during Carroll's first month of employment. Thompson returned from vacation in late July.

On or around July 10, 2017, Carroll informed Thompson that she was pregnant and had a September 15, 2017 due date. She relayed that she was planning to take six weeks of maternity leave.[2] Carroll stated that she was subsequently subjected to "constant comments from Ms. Thompson" regarding her pregnancy, such as "'make sure you don't go into labor early'" and "'keep that baby in until its due date.'" She said it caused her anxiety about her due date. She does not indicate if she communicated these concerns to Thompson.

In July or early August, Carroll asked Thompson what the staff was looking for in an administrator when they hired someone. Thompson says she told her there were "many different things that they had listed, one of those being a candidate of color." Carroll stated Thompson later told her she could not understand why staff wanted an administrator of color, and that the conversation made Carroll feel "sad, discouraged and very uncomfortable." Carroll says Thompson also began making comments suggesting she was unqualified for her position, such as "'you probably haven't had to do this.'" After being informed by

---

[2] In the District, school usually starts before Labor Day.

2

Thompson that Carroll needed support, the positive discipline trainer began consistently asking her if she needed help. Carroll stated this was because she asked Thompson why students were being sent to the office for small offenses. Carroll contends the comments made to the positive discipline trainer suggested she was not qualified for the assistant principal position. Thompson says during the summer, she and Carroll discussed the racial disparity regarding administrative discipline of students. Thompson recalls this discussion occurring in the context of a conversation about the positive discipline model used by administrators at Lakeridge.

Carroll unexpectedly went into labor on August 24, 2017. Thompson contacted Carroll several times during her maternity leave with what Carroll described as "'friendly' complaints about my absence and offers to come to my home and help with my baby."

Carroll returned from maternity leave on or around Monday, October 9, 2017. Upon her return from maternity leave, Carroll said Thompson complained to others about her unavailability during times she was pumping breastmilk. Carroll does not identify these individuals or when the statements were made. Thompson said she let Carroll know in July and when she returned from leave that she supported her pumping breastmilk at work. But, Thompson was concerned when she was unable to locate Carroll for long periods of time each day and when Carroll did not follow the protocol the school had for responding to her radio. Her assumption was that this inaccessibility was associated with Carroll's need to pump breastmilk. Thompson contacted Debra Tito, executive director of Human

Resources (HR), for guidance on accommodating Carroll's need to pump breastmilk at work. By October 15, 2017, Thompson and Carroll had agreed to a schedule for pumping. Thompson let Carroll know it was alright to put up a piece of butcher paper on the window of her door for privacy and to turn her radio off while pumping breastmilk.

Carroll also had concerns about comments she considered racially based made by Thompson. Lakeridge has a diverse student body, serving large Somali and African-American student populations. Carroll describes a meeting with the new teachers where Thompson described "'code switching' by our African-American Lakeridge students who live in Creston Point, a low-income housing development where many of the Lakeridge students live. . . . She believed students began "'posturing' and speaking aggressively and using poor language because they had to prepare themselves to go back to . . . the rough environment they lived in." Carroll said she "had heard of the term 'code-switch' in linguistics but not as an educational term or a term that referred to behavior." Carroll was the only African-American employee in the conversation. Hearing these generalizations made her feel "sad, belittled, and uncomfortable."

Carroll says Thompson also wanted to take new teachers on a driving tour of Creston Point "to give them a better sense of the poverty and desolation our students came from." This troubled Carroll, who has seen how student success can be limited by low expectations. She raised these concerns with Thompson, but says Thompson dismissed her concerns, presenting her "racially-biased

4

comments in an authoritative tone." The specifics of Thompson's comments are not in the record below.

Carroll says Thompson similarly dismissed her concerns over other incidents involving race. Carroll raised concerns over the frequency a student of color was sent to the office for small infractions, a student of color who was allowed to sit in class without doing work, and a lack of translation support for a non-English speaking Somali parent.

She also took issue with the frequency she was asked to take over lunch duty. On October 18, 2017, she says Thompson publicly yelled at her for being late to lunch duty.

After returning from maternity leave, Carroll was having difficulty locating before- and after-school childcare for her eight year old son, M.C., who attended a different elementary school in the district. The District's student school day for M.C. started later than Carroll's work day at Lakeridge. Thompson stated that Carroll would not be allowed to bring M.C. on campus to wait until his school start time. Carroll asserts the assistant principal at M.C.'s school offered to allow him to sit in her office and read until school started, but was told after a week she could no longer allow him to do so. On October 13, 2017, Carroll stated she left M.C. at home with her nanny and his younger brother. Monday and Tuesday of the following week, she took her son to school before coming to work. Thompson told her this was unacceptable and that she could not be late in order to take her son to school. Thompson also said she learned that Carroll had been leaving campus to take her son to school.

5

On Friday, October 20, 2017, Carroll left her son in the car at Lakeridge while she attended a staff training session inside. M.C. knocked on the locked door to the school crying after the car alarm had gone off. The school office manager let him in and pulled Carroll out of the training and informed her what had happened. Carroll did not return to the meeting. Instead, she stayed with her son and then drove him to school. After the meeting, the school office manager informed Thompson about what had occurred. Thompson states that after Carroll returned to campus, Carroll informed Thompson that she had left him in the car because she did not have anywhere else for him to stay until the school day started. Thompson told Carroll she would not file a Child Protective Services (CPS) report. Carroll left work early, telling Thompson she was feeling ill.

After Thompson's supervisor, Jessica Granger, asked why Carroll was not at school, Thompson informed her of what had occurred. Granger directed her to call HR. HR directed her to call CPS. Thompson then spoke with CPS on the phone and was directed to submit a written report. Thompson is a mandatory reporter.

Thompson then wrote a report of suspected child abuse and/or neglect. In her report, she wrote that Carroll had left her son in her car in the school parking lot on three occasions. She wrote that on the third occasion,

> At around 8:30am [M.C.] banged on the door of the Lakeridge main office. The office manager let him into the building and asked what was wrong. The office manager stated that [M.C.] was very upset and needed time to calm down before he could talk to her. Once he was calmer he shared with her that he had been in his mother's locked car and when he went to open the car door the alarm went off. He stated that he was very scared and did not have the key to

the car to turn off the alarm. In addition, on Friday October 13, 2017 Ms. Carroll told her supervisor that she had left [M.C.] at home that school day because she did not have a way to get him to school due to the late start time. There are no other known adults that live in the house with the family so I am concerned that he was left home alone all day.

That evening, Thompson left a voicemail message for Carroll informing her of the CPS report. She stated she was concerned the report "would make her upset and that it would make her not trust in me as her supervisor and that it would make her uncomfortable at work."

On Monday, October 23, 2017, Carroll contacted Debra Tito, executive director of HR, and scheduled a meeting to discuss the CPS report and her concerns about a hostile work environment. The meeting was scheduled to take place on October 27, 2017. She also contacted Dr. Elaine Love, the president of the District's Principal Association, to ask her to represent her in that meeting. On October 26, 2017, Love told Carroll she could not represent her, but agreed to attend the meeting.

On October 27, 2017, Carroll resigned. She sent a text message to Thompson and a letter of resignation later that day stating, "[T]he work environment has become too toxic to remain."

### Procedural History

In July 2018, Carroll filed a suit against the District for claims of discrimination, harassment, constructive discharge, and retaliation on the basis of race and pregnancy. On May 31, 2019, the District moved for summary judgment.

Carroll deposed several District employees. Leslie Ehrlich, who participated in Carroll's interview process, discussed staff conversations related to

7

the hiring process during her deposition. She stated that staff communicated their desire to have race be a consideration because they "really wanted our staff to reflect our students in terms of race and culture." She paraphrased Thompson as saying, "'What do you want me to do? Do you want me to just screen résumès based on names and pick from that?' alluding to should she screen names that appear to be someone who is African[-]American or [B]lack and pull those résumès to hire."

Thompson was questioned about the circumstances surrounding her report to CPS. She stated that Carroll told her she had left her son in her car before, on "either Wednesday or Thursday." Carroll asserts that she "did not tell her that." When asked about whether Carroll had told her she left M.C. "alone," Thompson replied, "I think she did, because I don't know why I would have assumed [he was] alone otherwise." Thompson also spoke about her concerns regarding Carroll's preparedness to fulfill her duties. In Carroll's first week back after returning from maternity leave, Thompson was concerned that Carroll was not prepared for how to interact with students who were "escalated," and was not sure "if she didn't have training to do that or she was feeling rusty coming back."

Angela Bogan, who provided support while Carroll was on maternity leave, stated she would have handled the situation leading to the CPS report differently. Bogan also recalled Thompson discussing code switching in reference to the behavior of students in an apartment building with "a high percentage students" of "East African descent." During her deposition, Thompson described student

behaviors such as an "increase in aggression" and preparing to "take care of themselves as adults when they go home" in reference to code switching.

An educational article in the record defines "code switching" as "assess[ing] the needs of the setting (the time, place, audience, and communicative purpose) and intentionally choos[ing] the appropriate language style for that setting." The article does not discuss the term in relation to behaviors or aggression. The article discusses the term in relation to helping "urban African[-]American students use language more effectively" by providing them with strategies to "reflect on the different dialects they use and to choose the appropriate language for a particular situation." Carroll felt her concerns that Thompson's comments were racially discriminatory were dismissed by Thompson.

Discovery also included communications between several District employees. An e-mail from Granger, the chief of school improvement, relayed to the assistant superintendent of learning and teaching that Carroll was pregnant, stating "the timing is really lousy." When Carroll delivered early, Thompson sent a text to her supervisor saying, "Guess which Lakeridge admin went into labor? Hint it's not me." Granger responded, "Wow, superb timing." There was also an e-mail thread regarding Carroll's resignation. On October 27, 2017, Tito informed Love the scheduled meeting was cancelled due to Carroll's resignation. Love replied to Tito saying,

> You get HUGE points for this one. LOL [(laugh out loud)]. She was so FRIGHTENED OF YOU that she didn't want to face the TITO-MATOR (Terminator). LOL. She called me last night and I told her she better think clearly about that decision. I guess she didn't listen.

9

Tito forwarded the response to Granger and Thompson.

On June 28, 2019, the summary judgment motion was heard. The court granted the District's motion for summary judgment. Carroll filed a motion for reconsideration. That motion was denied. Carroll then sought direct review of the order granting summary judgment in favor of the District by our Supreme Court. She asserted direct review was warranted because the appeal involves "a fundamental and urgent issue of broad public import which requires prompt and ultimate determination" as provided under RAP 4.2(a)(4). The court unanimously agreed to transfer the case to Division I of the Court of Appeals.

DISCUSSION

Carroll argues that the trial court erred in granting the District's motion for summary judgment. She argues summary judgment should be reversed under the existing standard because numerous issues of disputed fact exist in relation to her Washington Law Against Discrimination (WLAD), ch. 49.60 RCW, claims. Additionally, she argues that in order to effectuate the purposes of WLAD, this court should provide additional guidance to the lower courts by extending and adopting an evidentiary standard that accounts for judicial identity bias, similar to jury selection bias under GR 37.

I. <u>Summary Judgment</u>

Carroll asserts that genuine issues of material fact exist in relation to her claims under WLAD.

We review a trial court's grant of summary judgment de novo. <u>Camicia v. Howard S. Wright Constr. Co.</u>, 179 Wn.2d 684, 693, 317 P.3d 987 (2014).

Summary judgment is proper only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The court considers all facts and makes all reasonable factual inferences in the light most favorable to the nonmoving party. Young v. Key Pharm., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

WLAD prohibits employers from discharging or discriminating against any employee on the basis of a protected characteristic, including race and gender. RCW 49.60.180(2)-(3). WLAD is to be construed liberally to accomplish its purpose of preventing practices of discrimination, which "threaten[ ] not only the rights and proper privileges of [Washington's] inhabitants but menace[ ] the institutions and foundation of a free democratic state." RCW 49.60.010; RCW 49.60.020. Carroll's claims require her to establish discriminatory or retaliatory intent. See RCW 49.60.030(1); Cornwell v. Microsoft Corp., 192 Wn.2d 403, 414, 430 P.3d 229 (2018) (describing retaliation as an intentional act); Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 526-27 404 P.3d 464 (2017) (describing the difficulty for plaintiffs to prove intentional discrimination in employment discrimination cases).

Summary judgment is often inappropriate in discrimination cases brought under WLAD, as the evidence "will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury." Davis v. W. One Auto. Grp., 140 Wn. App. 449, 456, 166 P.3d 807 (2007). Direct, smoking gun evidence of discriminatory animus is rare, since there will seldom be eyewitness testimony as to the employer's mental processes.

11

Mikkelsen, 189 Wn.2d at 526. Accordingly, plaintiffs may rely on circumstantial, indirect, and inferential evidence to establish discriminatory action. Id.

However, the plaintiff must do more than express an opinion or make conclusory statements to overcome a motion for summary judgment. Marquis v. City of Spokane, 130 Wn.2d 97, 105, 922 P.2d 43 (1996). They must establish specific and material facts to support each element of their prima facie case. Id. When the plaintiff fails to raise an issue of material fact on one or more prima facie element of the claim, summary judgment remains appropriate. Johnson v. Chevron U.S.A., Inc., 159 Wn. App. 18, 27, 244 P.3d 438 (2010).

A plaintiff may establish a prima facie case of discrimination by either offering direct evidence of an employer's discriminatory intent, or by satisfying the burden-shifting test announced in McDonnell Douglas[3] that gives rise to an inference of discrimination. Kastanis v. Educ. Emps. Credit Union, 122 Wn.2d 483, 491, 859 P.2d 26, 865 P.2d 507 (1993); Alonso v. Qwest Commc'ns Co., 178 Wn. App. 734, 743, 315 P.3d 610 (2013).

First, the plaintiff must make a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802; Mikkelsen, 189 Wn.2d at 527. If the plaintiff establishes a prima facie case, it creates a rebuttable presumption of discrimination. Mikkelsen, 189 Wn.2d at 527.

Second, the burden shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id.

---

[3] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Third, if the defendant meets this burden, the plaintiff must produce sufficient evidence showing that the defendant's proffered reason is pretextual. Id. The plaintiff may demonstrate this by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual, or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer. Id.

Carroll asserts that she provided direct evidence of discrimination, but also shows a prima facie claim under the McDonnell Douglas framework. She does not offer analysis or citation to support her claim that she provided direct evidence, but analyzes her claims under McDonnell Douglas.

Carroll asserted claims of hostile work environment, constructive discharge, discrimination, and retaliation. She claims that the hostile work environment was in retaliation for her raising issues about disparate treatment of African-American students and for asserting her right to pump breast milk. Her discrimination claim relies on her claims of hostile work environment and constructive discharge as adverse employment actions.

II.  Hostile Work Environment

To establish a prima facie case of hostile work environment, Carroll must produce evidence that she was subjected to harassing conduct that (1) was unwelcome, (2) was due to her membership in a protected class, (3) affected the terms and conditions of her employment, and (4) is imputable to the employer. Loeffelholz v. Univ. of Wash., 175 Wn.2d 264, 275, 285 P.3d 854 (2012). Carroll must produce competent evidence that supports a reasonable inference that her

13

protected status was the motivating factor for the harassing conduct. Sangster v. Albertson's, Inc., 99 Wn. App. 156, 161, 991 P.2d 674, 678 (2000). It must be objectively and subjectively abusive. Adams v. Able Bldg. Supply, Inc., 114 Wn. App. 291, 297, 57 P.3d 280 (2002).

Carroll alleges four categories of harassing conduct to satisfy the first element of this claim. First, she alleges "she was constantly underestimated, belittled and disrespected by her subordinates." Those allegations are not supported by details such as identities of the parties, the content of the statements, the nature of the actions, or dates, times, and places of the incidents. Such conclusory allegations are not facts and do not raise questions of fact.

Second, she alleges she was "discouraged from pumping breastmilk at work to the point that she was often engorged and in discomfort." Carroll claims that upon her return from maternity leave, Thompson complained to other individuals about her unavailability during times she was pumping breastmilk. She does not identify from whom she learned about the comments, the content of the comments, to whom the comments were made, when they were made, or in what context they were made. Thompson indicated in her deposition a need to be aware of Carroll's availability throughout the school day. Thompson indicated that Carroll's first week back after maternity leave, she had issues locating Carroll or reaching her by radio per school protocol. Carroll does not argue that turning off her radio and/or not responding to calls would not have been a violation of school protocol. She does not argue that Thompson did not need to know her whereabouts. Carroll stated that she never turned her radio off during school

hours, instead she claims she could not hear the radio during lunch. Thompson indicates that Carroll informed her that she would need to pump breast milk several times a day, but was not told when or for how long. Carroll does not argue that Thompson told her she could not pump her breastmilk.

Carroll's claim that "Thompson initiated an investigation by the highest levels of HR around Ms. Carroll's physiological need to pump breastmilk at work" is without sufficient evidentiary support. The record shows that Thompson spoke with her supervisors only for direction about how to manage Carroll's need to pump breastmilk. And, by Carroll's own admission, she and Thompson agreed to a plan for Carroll to pump breastmilk at specific times of the day. This plan was in place by October 15, 2017. Carroll had worked only five days before the plan was put in place. Carroll acknowledges that she did not utilize all of the time afforded to her by that plan.

Still, Carroll alleges "scrutiny on [her] pumping breastmilk" continued despite the plan being put in place. The evidence she relies on for this assertion is an exchange with office assistant Kristina Jaramillo, who asked her to ensure she covered her window only while pumping, as a safety precaution. Carroll argues this insinuated she was creating a safety issue by trying to have some privacy while pumping breastmilk. However, Thompson stated the window covering was part of the plan they had agreed to. And, the request by Jaramillo was made in an e-mail informing Carroll that she had removed the paper while another person used the office. School policy provided that door windows to rooms in the school were not allowed to be covered when students might be present. The

request to remove the paper from the window when it was not needed for privacy could not reasonably be inferred to mean that pumping breastmilk was itself a safety issue.

A reasonable person could not find that the District's response to her need to pump breastmilk constituted discrimination.

Third, she alleges, "Thompson surveilled and investigated Ms. Carroll's child care situation, a proxy for her testing Ms. Carroll's fitness as a mother." She provides no details to support this claim. And, the record shows only that Thompson told the office administrator to "let me know what time Ms. Carroll had gotten to work and if she noticed if [Carroll] left campus, because we had already had issues where she had left campus, and I couldn't always be in the office."

Carroll had made Thompson aware of her lack of childcare and its effect on her punctuality. The District's student school day for M.C. started later than Carroll's work day at Lakeridge. Thompson stated that Carroll would not be allowed to bring M.C. on campus to wait until his school start time. Carroll asserts the assistant principal at M.C.'s school offered to allow him to sit in her office and read until school started, but was told after a week she could no longer allow him to do so. On October 13, 2017, Carroll stated she left M.C. at home with her nanny and his younger brother. Monday and Tuesday of the following week, she took her son to school before coming to work. Thompson told her this was unacceptable and that she could not be late in order to take her son to school.

When Thompson spoke with Granger about Carroll bringing her son to work, Granger reminded her that teachers were not allowed to bring their children

to school in this manner and asserted that an administrator would not be able to either. Carroll does not argue that this was not the district's policy, or that on its face, it discriminated against mothers. She does not demonstrate that she was treated differently under the policy because of her race or status as a mother, than were other employees. She has not provided evidence that it was objectively abusive for her direct supervisor to monitor her work attendance and compliance with school district policy. The record does not raise a question of fact let alone state any facts in support of the claim that Thompson was testing Carroll's fitness as a mother.

Finally, Carroll raises the CPS report as harassing conduct. Carroll claims that Thompson did not follow District protocol in filing her report. District policies and procedures related to child abuse and neglect provide,

> When there is reasonable cause to believe that a student has suffered abuse or neglect, staff or the principal shall immediately contact the principal, nurse, or counselor, who will then contact the nearest office of the Child Protective Services (CPS) of the Department of Social and Health Services (DSHS). . . . Any doubt about the child's condition shall be resolved in favor of making the report.

"Inadequate supervision (unattended)" is listed as an indicator of physical neglect. Carroll does not dispute that she left her son in the car unattended. She asserts that leaving a child in a car unattended was not evidence of neglect. When Carroll's son knocked on the school door he was crying, having become scared while sitting alone in Carroll's car. A member of the staff observed an indicator of physical neglect and reported it to Thompson, the principal. Thompson was initially

17

disinclined to file a report and indicated that to Carroll. But, at the direction of her supervisor, Thompson contacted HR and was instructed to contact CPS.

Though Carroll notes Thompson did not personally observe signs of neglect, Washington law specifically requires Thompson to report instances of suspected child neglect on the basis of either firsthand or credible secondhand information. RCW 26.44.030(1)(a), (b)(i)-(iii). There is no evidence in the record that the District could have or would have responded differently on these facts if the employee was not a member of a protected class.

Carroll also alleges discriminatory motive is evidenced by the content of the CPS report. She asserts that, in the report, Thompson misstated that M.C. was left home alone the previous Friday, and that Carroll left M.C. in the car on two other days. Thompson states in her deposition that she believed Carroll had told her she left her son home alone. If this raises a question of fact about what is true, it still does not raise a material question of fact about whether Carroll's conduct was required to be reported to CPS. Thompson was legally obligated to file the report. Nothing establishes that its filing was discriminatory or properly considered as creating a hostile work environment. Nor could the content itself have supported a hostile work environment claim because Carroll did not learn of the full contents of the report or Thompson's deposition until after her employment ended. A reasonable person could not infer from the facts that filing the CPS report in this instance constituted discrimination. There is insufficient evidence to make a prima facie case for a hostile work environment claim.

The trial court did not err in granting the District's motion for summary judgment on her claim of hostile work environment.

III.    Constructive Wrongful Termination

Constructive discharge occurs where "an employer deliberately makes an employee's working conditions intolerable, thereby forcing the employee to resign." Sneed v. Barna, 80 Wn. App. 843, 849, 912 P.2d 1035 (1996). The court asks whether "'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" Id. (quoting Stork v. Int'l Bazaar Inc., 54 Wn. App. 274, 287, 774 P.2d 22 (1989)).

Carroll relies on the existence of a hostile work environment and on an e-mail from Love to Tito to argue her constructive wrongful termination claim should not have been dismissed on summary judgment. Carroll failed to make a prima facie case of a hostile work environment. Carroll does not allege either District employee threatened to fire or otherwise discipline her prior to her resignation. And, the content of the e-mail was not known to her when she resigned.

On Monday, October 23, 2017, Carroll contacted Tito and scheduled a meeting to discuss the CPS report and her concerns about a hostile work environment. The meeting was scheduled to take place on October 27, 2017. She also contacted Love, president of the District's Principal Association, to ask her to represent her in that meeting. On October 26, 2017, Love told Carroll she could not represent her, but agreed to attend the meeting. Carroll cites to the October

19

27, 2017 e-mail exchange between Tito and Love canceling the scheduled meeting due to Carroll's resignation. In one e-mail, Love replied,

> You get HUGE points for this one. LOL. She was so FRIGHTENED OF YOU that she didn't want to face the TITO-MATOR (Terminator). LOL. She called me last night and I told her she better think clearly about that decision. I guess she didn't listen.

Carroll did not know the content of this e-mail prior to her resignation. It could not have contributed to her feeling constructively discharged.

The trial court did not err in granting the District's motion for summary judgment on her claim of constructive wrongful termination.

IV.    Retaliation

To raise a retaliation claim, Carroll must show (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her activity and the other person's adverse action. Currier v. Northland Servs., Inc., 182 Wn. App. 733, 742, 332 P.3d 1006 (2014). Proximity in time between the adverse action and the protected activity, along with evidence of satisfactory work performance, suggests an improper motive. Campbell v. State, 129 Wn. App. 10, 23, 118 P.3d 888 (2005). A viable retaliation claim requires a causal connection between the protected activity and the alleged retaliatory action. Boyd v. State, 187 Wn. App. 1, 11-12, 349 P.3d 864 (2015).

Here, Carroll asserts the protected activities were raising issues regarding disparate treatment of African-American students and her right to pump breastmilk under RCW 43.10.005. She asserts Thompson then created a hostile work

20

environment—"including her malicious CPS report"—soon after exercising those rights

Carroll relies on the creation of a hostile work environment as the adverse employment action. But, as discussed above, Carroll failed to establish there was a hostile work environment. And, as the District notes, to the extent that Carroll alleges "Thompson's discriminatory animus was apparent even before she recommended that [Carroll] be hired," that animus could not have been retaliatory. Thus, her claim lacks evidence of causation.

Carroll also raised the CPS report as a retaliatory adverse action. As discussed above, Thompson was directed to file the report by District personnel. Carroll has failed to establish that Thompson was not legally obligated to file the report. Carroll has failed to provide evidence that the personnel who directed Thompson to file the report did so in retaliation for her raising issues of disparate treatment or pumping breastmilk. Absent such proof, there is no causal connection between the protected activities and the alleged retaliatory action. [4]

The trial court did not err in granting the District's motion for summary judgment on her retaliation claim.

---

[4] Carroll also argues "the District's vague evidentiary challenges should be considered on appeal." She claims that below, the District argued certain evidence was inadmissible, which the trial court "noted." It is not clear that the trial court excluded any documents objected to by the District. However, de novo review inclusive of these documents fails to establish sufficient evidence to support Carroll's claims. Any error in excluding the documents would have been harmless.

V.    Discrimination

A plaintiff establishes a prima facie case of disparate treatment in the workplace by providing evidence that (1) the defendant employer acted with a discriminatory motive and (2) the discriminatory motivation was a significant or substantial factor in an employment decision. Alonso, 178 Wn. App. at 744. A hostile work environment may constitute an adverse employment action. Id. at 746.

Carroll asserts that she was subjected to an adverse employment action in the form of a hostile work environment and constructive wrongful discharge. We have rejected her argument that a prima facie claim of either a hostile work environment or constructive wrongful discharge have been established.[5]

The trial court did not err in granting the District's motion for summary judgment on Carroll's discrimination claims.

VI.    Adoption of a New Standard

The bulk of Carroll's briefing argues for the adoption of a new evidentiary standard in discrimination cases brought under WLAD. Citing several law review

---

[5] Without an adverse employment action, we need not proceed to the burden-shifting analysis. Carroll argues that she was "replaced by a lesser qualified Caucasian," asserting the burden then shifts to the District. Carolyn Hahn started in the assistant principal role on November 7, 2017. Carroll cites to an October 27, 2017, e-mail from Granger to several District employees detailing their intent to reach out to Hahn to "fill the [assistant principal] position at Lakeridge." The e-mail shows the District was eager to replace Carroll with Hahn, who did not have the same credentials as Carroll. But, according to the e-mail, the District had not yet reached out to Hahn the day after Carroll's resignation. That the District was eager to fill the opening created by Carroll's resignation is not proof she was constructively discharged. It does not matter who was hired after Carroll resigned if she was not constructively wrongfully discharged.

articles detailing how judicial understanding about reasonability may be informed by the identities of judges, she points to "[g]rowing social science research."

Seeking direct review from our Supreme Court, she noted Washington recently adopted GR 37, which tasks trial court judges with evaluating allegations of racial bias in jury selection under an "objective observer" standard. Carroll argues adopting this standard for trial courts making determinations in discrimination cases would provide needed guidance to the trial court in how to determine a "reasonable inference" of discrimination.

The Supreme Court declined Carroll's request for direct review. Carroll concedes the status of the law is to apply the standard as described above, arguing her claims are viable even under that standard. We decline to extend a new standard.

We affirm.

Appelwick, J.

WE CONCUR:

Mann, C.J.

Verellen, J.

23