FILED
COURT OF APPEALS
DIVISION II

2013 DEC 31 AM 9: 14

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JOSEPH ALONSO and MARIE ALONSO, husband and wife and the marital community thereof, | No. 43703-1-II |
| Appellants, | |
| v. | |
| QWEST COMMUNICATIONS COMPANY, LLC, a Washington corporation, and BEN MARTINEZ, supervisor, | PUBLISHED OPINION |
| Respondents. | |

JOHANSON, J. — Joseph Alonso sued his employer, Qwest Communications Company LLC; and his supervisor, Ben Martinez, for discrimination; the superior court granted Qwest summary judgment dismissal of Alonso's complaint.[1] Alonso appeals, arguing that he provided sufficient evidence to establish prima facie discrimination claims for (1) disparate treatment, (2) a hostile work environment, and (3) unlawful retaliation. Viewing the record in a light most favorable to the nonmoving party, we hold that Alonso established prima facie disparate

---

[1] Joseph and Marie Alonso, a marital community, are the plaintiffs; we use "Alonso" to identify the plaintiff. Though Qwest and Martinez are defendants, we use "Qwest" when referring to the defendants and "Martinez" when referring to Martinez individually.

treatment and hostile work environment claims; thus, we reverse the superior court's summary judgment dismissal on those matters. Holding that Alonso failed to establish a prima facie retaliation case, however, we affirm the superior court's summary judgment dismissal of that claim.

## FACTS

### I. WORKPLACE

Alonso is a Mexican-American Gulf War combat veteran who receives partial disability due to a service-related back injury and post traumatic stress disorder (PTSD). Since childhood, he has suffered from a speech impediment that required doctors to surgically modify the roof of his mouth.

In 1999, Qwest hired Alonso as a Central Office Equipment Installation Technician to install and maintain network infrastructure.[2] In 2006, Alonso was reassigned from the central office to a position that services customer location sites, which became known as an "AQCB"[3] position. Several months before Alonso was reassigned to AQCB duty, Qwest provided him with a new work van, a cellular telephone, office space, and a computer.[4]

When Alonso was reassigned to AQCB duty, two people performed AQCB responsibilities. Alonso enjoyed AQCB work, and in 2007, according to Alonso, he and his then-coworker, William Kling, achieved the distinction of "being first in quality and productivity

---

[2] We refer to Alonso's employer as Qwest because that is the named party involved here. The record, however, refers to Alonso's employer as US West, Qwest, and Century Link.

[3] The meaning behind the acronym "AQCB" is unclear from the record.

[4] It is unclear when, exactly, Alonso received his cellular telephone, office space, and computer.

over a 14 state region." Suppl. Clerk's Papers (CP) at 232. The next year, however, Martinez became Alonso's manager. Martinez, also a Mexican-American and military veteran, practiced a management style with which Alonso did not agree; and by April 2010, their work relationship had soured.

Alonso alleges that Martinez surrounded himself with other Qwest employees, Jose Zuniga, Brad Tuttle, and Dave Thomas, who collectively treated Alonso poorly and tormented him because of his military status, Mexican heritage, and disabilities, including his speech impediment. To Alonso's disgust, Martinez and other employees also used offensive workplace language. According to Alonso, Martinez and Zuniga referred to Mexicans as "Spics." CP at 115. Coworkers also described Alonso's speech as like a "ghetto Hispanic," and Zuniga contrasted himself to Alonso because he "spoke correct English," unlike Alonso. CP at 144, 145. The harassment was so open that Alonso's colleagues noticed that some employees, including Martinez, mocked Alonso's speech.

Alonso stated that Martinez knew that Alonso suffered from combat-related disabilities, including PTSD, and held this against him. According to Alonso, Martinez "hated the fact that [Alonso] was receiving disability pay," commenting, "I will tell you what I hate, people that served in the first Gulf War for five days and claim a disability"; and Martinez added, "I served and I got crap." Suppl. CP at 233.

In April 2010, Alonso phoned Qwest's Corporate Ethics and Compliance Advice Line (hotline) and reported that Martinez was corrupt, mistreated Alonso by subjecting him to

heightened scrutiny, and allowed employees to engage in inappropriate workplace behavior.[5] Alonso did not report to the hotline any conduct that related to or targeted him based on his protected statuses.

At the first safety meeting following Alonso's initial hotline call, on May 20, Martinez told the entire staff, including Alonso, that "someone had called in" and that "someone is throwing rocks at the big dog and that big dog is going to get you and that big dog is me." Suppl. CP at 234. Alonso felt that Martinez made a "mockery" of his hotline complaint. CP at 77. Employee Margaret Buechel stated, "It was obvious from the way that Ben [Martinez] was acting towards Joseph [Alonso] that he knew that Joseph had complained." CP at 145. At that same safety meeting, Martinez assigned the crew new schedules. To Alonso's dissatisfaction, Martinez changed Alonso's hours so that, rather than starting work at 5:00 a.m., he would begin at 6:00 a.m. Following the meeting, Martinez e-mailed the staff that they could no longer report to work early to earn overtime; but, according to Alonso, Martinez continued to allow Zuniga to begin working at 5:00 a.m., one hour before his shift began.

Alonso followed his April hotline call with several other hotline calls in May 2010. During these May calls, Alonso claimed that (1) Martinez retaliated against him for reporting Martinez in April; (2) Martinez had told other employees that Alonso had complained about their behavior to the hotline and, consequently, coworkers vandalized Alonso's work station; (3) since Alonso initially complained to the hotline, Martinez had reviewed his work with even greater

---

[5] Alonso also states that he claimed that he reported "prejudice" against him, but the partially redacted hotline reports do not show a report of prejudice in the hotline calls. CP at 108.

4

scrutiny. For example, on May 11, 2010, Alonso was in the middle of working a Fort Lewis job when Martinez telephoned and asked Alonso to leave for a project at Good Samaritan Hospital and "do whatever it takes" to finish it. Suppl. CP at 235. Alonso finished the hospital job; but when Alonso told Martinez that he had worked 11 hours, Martinez told him to manipulate his time card to read that he had only worked 8 hours. Martinez also threatened to change Alonso from a 4-day, 10-hour work week, to a 5-day, 8-hour work week.

Eventually, Martinez reassigned Alonso from AQCB back to the central office. According to Alonso, Martinez also forced him to trade his "nice" work van for "an old junky van" and required Alonso to return his cellular telephone[6] and computer. Suppl. CP at 234, 235. Alonso stated that Martinez did not select him for "lucrative 'per diem' jobs"[7] and barred him from earning overtime. Suppl. CP at 235. As Buechel characterized it, "After Ben started looking at Joseph [Alonso,] negative things began to happen to Joseph." CP at 145. For example, one day, when Alonso was away from his desk, either Tuttle or Zuniga spread hand sanitizing liquid over Alonso's desk telephone, to the point that it was dripping. At other times, Zuniga glued a computer mouse to the mouse pad at Alonso's work station; and someone applied a greasy substance to Alonso's mouse. Alonso also once found a wet puddle in his work chair.

---

[6] Other employees, including Martinez, Laurie Gonce, Jonathan King, Tuttle, Zuniga, Matthew Dillon, and Shawn Breer, all continued to use their Qwest-issued cellular telephones.

[7] Alonso characterized "per diem jobs" as out-of-town projects that have potential to yield higher earnings. According to Alonso, Thomas, Tuttle, and others "worked several weeks and even several months per year" in those jobs. Suppl. CP at 238. Martinez denied Alonso's claim, saying that he had never denied Alonso a per diem job.

## II. PROCEDURE

Alonso filed a complaint against Qwest under the Washington Law Against Discrimination (WLAD),[8] alleging disparate treatment, harassment, discrimination, and retaliation based on his combat veteran, disabled person, and Mexican-American statuses. Qwest moved for summary judgment. The superior court ruled that Qwest was entitled to judgment as a matter of law, granted summary judgment to Qwest, and dismissed Alonso's WLAD complaint. Alonso appeals.

## ANALYSIS

We review summary judgment orders de novo, viewing the facts in the light most favorable to the nonmoving party. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). Trial courts properly grant summary judgment where the pleadings and affidavits show no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

## I. DISPARATE TREATMENT CLAIM

Alonso first argues that, because he established a prima facie disparate treatment claim under both the direct evidence and *McDonnell Douglas*[9] tests, the superior court erred when it improperly determined that Qwest was entitled to summary judgment as a matter of law. Viewing the evidence in a light most favorable to Alonso, we hold that Alonso produced

---

[8] Ch. 49.60 RCW.

[9] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

sufficient evidence to establish a prima facie disparate treatment claim under the direct evidence test.[10] Thus, the superior court improperly granted Qwest summary judgment on this claim.

## A. Rules of Law

Disparate treatment occurs when an employer treats some people less favorably than others because of race, color, religion, sex, or other protected status. *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 354 n.7, 172 P.3d 688 (2007). To establish a prima facie disparate treatment discrimination case, a plaintiff must show that his employer simply treats some people less favorably than others because of their protected status. *Johnson v. Dep't of Soc. & Health Servs.*, 80 Wn. App. 212, 226, 907 P.2d 1223 (1996). A plaintiff may establish a prima facie case by either offering direct evidence of an employer's discriminatory intent, or by satisfying the *McDonnell Douglas* burden-shifting test that gives rise to an inference of discrimination. *Kastanis v. Educ. Emps. Credit Union*, 122 Wn.2d 483, 491, 859 P.2d 26, 865 P.2d 507 (1993).

Under the direct evidence test, a plaintiff can establish a prima facie case by providing direct evidence that (1) the defendant employer acted with a discriminatory motive and (2) the discriminatory motivation was a significant or substantial factor in an employment decision. *Kastanis*, 122 Wn.2d at 491. We generally consider an employer's discriminatory remarks to be direct evidence of discrimination. *See Johnson v. Express Rent & Own, Inc.*, 113 Wn. App. 858,

---

[10] Because we rely on direct evidence, we need not perform a *McDonnell Douglas* burden-shifting analysis. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

862-63, 56 P.3d 567 (2002) (reversing summary judgment based on supervisor's ageist comments that plaintiff did not fit company's image of "a youthful, fit, 'GQ' looking mold").[11]

## B. Discriminatory motive

To satisfy the direct evidence test, Alonso must show that Qwest acted with discriminatory motive in taking an adverse employment action against him based on his protected status as either a veteran, Mexican-American, or disabled person.[12] *See Kastanis*, 122 Wn.2d at 491. Alonso recounts as direct evidence of discriminatory motive, Martinez's stated hatred of disabled combat veterans, "I will tell you what I hate, people that served in the first Gulf War for five days and claim a disability." Suppl. CP at 233. This comment does not expressly reference Alonso, but the record demonstrates that Alonso was the only disabled Gulf War combat veteran at Qwest and that he claimed a 40 percent combat disability stemming from his service. Martinez knew of Alonso's combat veteran status and, according to Alonso, even "stated that he hated the fact that I was receiving disability pay." Suppl. CP at 233. Here, as in

---

[11] Because our discrimination laws substantially parallel Title VII of the Civil Rights Act of 1964, we may look to federal law for guidance. *Xieng v. Peoples Nat'l Bank of Wash.*, 120 Wn.2d 512, 518, 844 P.2d 389 (1993).

[12] Veteran status, national origin, and disability are all protected statuses. RCW 49.60.180(3). "Disability" may include physical impairments, physiological disorders, or conditions that affect one's speech organs. RCW 49.60.040(7)(c)(i). Our administrative regulations, too, provide that a student with speech impediments has a disability, making the student eligible for special education. *See* WAC 392-172A-01035.

Qwest asserts that Alonso forfeited any argument that Martinez was motivated by anti-Mexican bias because he did not present this argument at summary judgment. Alonso concedes that trial counsel did not specifically brief Alonso's protected status based on national origin; but he contends that he submitted evidence of hostile and offensive comments directed at him. In his response to Qwest's summary judgment motion, for example, Alonso stated that "he was treated differently or in a disparate manner due to his . . . Mexican national origin." Suppl. CP at 219. Qwest's argument, therefore, fails, because Alonso called the issue of national origin to the superior court's attention on summary judgment. *See* RAP 9.12.

*Johnson*, a supervisor expressly stated discriminatory distaste for an employee with a protected status. While the *Johnson* supervisor made ageist comments to an older employee (telling the employee he did not fit the company's "youthful, fit, 'GQ' looking mold"), here Martinez openly stated that he hated disabled Gulf War combat veterans and specifically that he hated that Alonso was disabled and receiving disability pay.

Similarly, Alonso produced evidence that Martinez referred to Mexicans as "Spics" and allowed others to also use the term. CP at 115. Employees, including Martinez, openly mocked Alonso's speech impediment and accent, described his speech as that of a "ghetto Hispanic," and contrasted themselves to Alonso because they "spoke correct English," unlike him. CP at 144, 145. This open mocking based on Alonso's national origin and speech impediment constitutes further direct evidence of discriminative intent, specifically relating to Alonso's protected disability and national origin statuses. Viewing this evidence in a light most favorable to Alonso, we hold that the evidence sufficiently proved that Martinez acted with a discriminatory motive toward Alonso, a disabled, military veteran of the Gulf War and a man of Mexican-American heritage.

### C. Significant or Substantial Factor in Employment Decision

We must next determine whether the discriminatory motive was a significant or substantial factor in an employment decision relating to Alonso. *See Kastanis*, 122 Wn.2d at 491. An adverse employment action involves a change in employment conditions that is more than an inconvenience or alteration of one's job responsibilities, such as reducing an employee's workload and pay. *Campbell v. State*, 129 Wn. App. 10, 22, 118 P.3d 888 (2005), *review denied*, 157 Wn.2d 1002 (2006). A demotion or adverse transfer, or a hostile work environment, may

also amount to an adverse employment action. *Kirby v. City of Tacoma*, 124 Wn. App. 454, 465, 98 P.3d 827 (2004), *review denied*, 154 Wn.2d 1007 (2005).

### 1. Adverse transfer

Here, Martinez removed Alonso from AQCB duty, and transferred him to the central office. While both positions did the same work for the same pay and fell within the same union contract classification, Martinez stated that the AQCB position came with "some benefits," including a newer van, cellular telephone, and preference in employer-supplied workstations, computers, and desk telephones. CP at 47. In *O'Neal v. City of Chicago*, 392 F.3d 909, 912 (7th Cir. 2004), the Seventh Circuit held that the loss of a plaintiff's cellular telephone, pager, vehicle, and parking space did not amount to an adverse employment action when those benefits were associated with the position from which the plaintiff was transferred. Thus, if Alonso's newer van, cellular phone, and preference for workplace stations were tied to his AQCB position, under *O'Neal*, he could not prove an adverse action against him for loss of these benefits when he was reassigned out of the AQCB back to the central office.

But, the parties dispute the role of the newer van and cellular telephone. Martinez states that the newer van was for the AQCB employee because that employee interacted with customers and should drive the nicer vehicle. Alonso, however, claims that he was assigned the newer van "[s]everal months" before he became an AQCB employee, dispelling the idea that he was assigned the van only because of his AQCB capacity. Suppl. CP at 232. Also, the record demonstrates that Qwest assigned a number of Qwest central office employees cellular phones, not just AQCB employees. Because the record is conflicting regarding whether the newer van and Qwest-issued cellular telephone were tied to the AQCB position, *O'Neal* is unavailing.

Viewed in a light most favorable to Alonso, the van and cellular phone benefits, as well as the preference in employer-supplied workstations, computers, and desk telephones, were not *strictly* tied to the AQCB position and thus, a reasonable juror could conclude that when Alonso was transferred from AQCB and was forced to also relinquish those "benefits," he suffered an adverse employment action.

2. Adverse action through hostile work environment

Alonso also claims that he suffered from a negative employment decision—being subjected to an increasingly hostile work environment as the subject of harassment targeting his protected statuses.

The WLAD is not intended as a general civility code. *Adams v. Able Bldg. Supply, Inc.*, 114 Wn. App. 291, 297, 57 P.3d 280 (2002). And not everything that makes an employee unhappy is an actionable adverse action. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).

Alonso offers evidence of various derogatory comments made by Martinez or other employees. In his deposition, he recounted how Martinez referred to Mexicans as "Spics." CP at 115. Workers also openly mocked Alonso's speech impediment and accent; some described his speech as like a "ghetto Hispanic" and contrasted themselves to Alonso because they "spoke correct English," unlike him. CP at 144, 145. And, Alonso stated that Martinez made fun of his veteran status and PTSD by asking, "[A]re you crazy or something?" and, "[D]id you know Vietnam was over in 1978?" Suppl. CP at 233.

Viewed in a light most favorable to Alonso, the evidence showed that Martinez and other employees openly bullied and condoned the bullying of Alonso because of his accent stemming

11

from his Mexican-American heritage and speech impediment disability, as well as his disabled veteran status. The bullying was so pervasive that other employees noticed and sympathized with Alonso; one coworker opined that Alonso's treatment was so bad that "[i]t was evident in the way that Ben Martinez treated Joseph Alonso that he did not like him and that he was trying to make Joseph's working conditions so poor that Joseph would quit." CP at 140. Because of the severity of this unbridled bullying and harassment, this hostile work environment amounted to an adverse employment action.

## D. Conclusion

We hold that Alonso has sufficiently established a prima facie disparate treatment case under the direct evidence test. We view the evidence in a light most favorable to Alonso as the nonmoving party and further hold that Alonso produced direct evidence of (1) Martinez's discriminatory motive—his hatred toward Alonso as a disabled Gulf War veteran with a speech impediment, and (2) how he suffered adverse employment decisions—loss of his newer van and cell phone, and an increasingly hostile work environment laden with bullying and mockery of his Mexican-American heritage and disabilities.

## II. HOSTILE WORK ENVIRONMENT

Alonso next argues that he presented sufficient evidence of a hostile work environment to defeat summary judgment for Qwest. Specifically, Alonso contends that Martinez and others made comments based on their animus toward his protected statuses; their harassment affected his employment; and Martinez's participation in the harassment is imputed to Qwest. Viewing the evidence in a light most favorable to Alonso, we hold that Alonso presented sufficient evidence to establish a prima facie hostile work environment case.

12

To establish a prima facie hostile work environment claim, the plaintiff must allege facts proving that (1) the harassment was unwelcome, (2) the harassment was because the plaintiff was a member of a protected class, (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer. *Loeffelholz v. Univ. of Wash.*, 175 Wn.2d 264, 275, 285 P.3d 854 (2012). Harassment is only actionable if it is sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment. *Antonius v. King County*, 153 Wn.2d 256, 261, 103 P.3d 729 (2004).

### A. Harassment Motivated by Alonso's Protected Status

The parties do not dispute that Alonso did not welcome any hostility or harassment. Therefore, we next analyze whether Alonso's protected status motivated the harassment.

To establish the second element of a hostile work environment claim, a plaintiff need only produce "evidence that supports a reasonable inference that [his protected class status] was the motivating factor for the harassing conduct." *Doe v. Dep't of Transp.*, 85 Wn. App. 143, 149, 931 P.2d 196, *review denied*, 132 Wn.2d 1012 (1997). Here, Martinez openly expressed that he hated that Alonso was a disabled Gulf War combat veteran. Martinez even compared his own veteran status with Alonso's, noting, "I served and I got crap." Suppl. CP at 233. This evidence, alone, supports a reasonable inference that Martinez's hatred for Alonso as a disabled Gulf War combat veteran motivated Martinez's harassing conduct and condoning of others' harassing conduct—including other employees bullying Alonso and vandalizing his work station—satisfying the second element in establishing a prima facie hostile work environment claim.

Also, Alonso offered evidence that Martinez and others subjected Alonso to racially derogatory language. For example, Alonso testified in his deposition that Martinez characterized Alonso as "not a real Mexican" based on Alonso's eating habits. CP at 114. Alonso also testified that Martinez and other coworkers referred to Mexicans as "Spics." CP at 115. Buechel declared that a coworker said Alonso spoke like a "ghetto Hispanic"; and, Zuniga contrasted his own speech with Alonso's, saying that Zuniga spoke "correct English," unlike Alonso. CP at 144, 145. Buechel also recalled a time that Martinez said Alonso "didn't speak good English." CP at 144. A jury could reasonably conclude that subjecting Alonso to derogatory racial name-calling was motivated by racial or ethnic reasons and that comments touching on Alonso's English skills implied racial and ethnic motivations based on Alonso's Mexican heritage.[13]

Moreover, Alonso, hampered by a speech impediment, offered evidence that he was the regular victim of open mocking for his speech. When a coworker reminded Martinez that Alonso suffered from a speech impediment, an apparent plea for compassion, Martinez ignored her. So here, we can reasonably infer that the mocking of Alonso's speech was at least partially motivated by his speech impediment, a disability, which also satisfied the second element in establishing a prima facie hostile work environment claim.

---

[13] Qwest argues that these racial comments were not directed at Alonso personally. But a defendant need not levy derogatory racially charged language directly at the plaintiff to subject the plaintiff to a hostile work environment and survive summary judgment. *See Davis v. West One Automotive Group*, 140 Wn. App. 449, 457, 166 P.3d 807 (2007), *review denied*, 163 Wn.2d 1040 (2008) (defendant's derogatory statements about Dr. Martin Luther King, Jr. and calling African American plaintiff a "bitch" could be considered racially motivated and subjected plaintiff to hostile work environment).

B. Harassment's Effect and Consequences

Next, the parties disagree whether the harassment affected the terms and conditions of Alonso's employment.

To determine whether conduct was severe or pervasive enough to affect the terms and conditions of employment, we look at the totality of the circumstances, including the frequency and severity of harassing conduct, whether it was physically threatening or humiliating, or merely an offensive utterance, and whether it unreasonably interfered with the employee's work performance. *Washington v. The Boeing Co.*, 105 Wn. App. 1, 10, 19 P.3d 1041 (2000). Whether offensive comments affect the conditions of employment is a factual question. *See Davis v. West One Auto. Group*, 140 Wn. App. 449, 457, 166 P.3d 807 (2007) (holding that employee's alleged humiliation and self-diagnosed mental sickness from "racially charged" workplace comments raised inference that condition resulted from hostile work environment), *review denied*, 163 Wn.2d 1040 (2008). But casual, isolated or trivial manifestations of a discriminatory environment do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law. *Washington*, 105 Wn. App. at 10.

Here, employees, including Martinez, used the racially derogatory "Spics" to refer to some Mexicans. CP at 115. Coworkers also characterized Alonso and his speech as like that of a "ghetto Hispanic," implying that he spoke incorrect English. CP at 144. And, coworkers openly mocked Alonso's speech, to the point that another employee confronted Martinez in Alonso's defense. Finally, Martinez expressed his hatred for Alonso's disabled Gulf War combat veteran status.

The harassment was so severe that in June 2010, Alonso visited a psychiatry emergency room in response to "great stress at work" and an upsurge in PTSD symptoms. Suppl. CP at 242. Given the extent of harassment to which Alonso was subjected, and the medically documented effect it had on his mental wellbeing, we hold that he sufficiently demonstrated that the alleged harassment affected the terms and conditions of his employment.

### C. Harassment Imputable to Qwest

Next, the parties disagree whether the alleged harassment may be imputable to Qwest. Harassment is imputed to an employer when an owner, manager, partner or corporate officer personally participates in the harassment. *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 401, 407, 693 P.2d 708 (1985). Managers are those whom the employer has given authority and power to affect the hours, wages, and working conditions of the employer's workers. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 48 n.5, 59 P.3d 611 (2002).

Under this test, we analyze whether Martinez was a "manager"; so we must review whether he enjoyed the authority to affect the hours, wages, and working conditions of Qwest employees. *See Robel*, 148 Wn.2d at 48 n.5. Here, the record includes evidence that Martinez, a QTI Operation Supervisor, set his crew's hours; for example, in a June 2010 e-mail, Martinez advised his crew of their new work schedules and start times. Alonso declared that Martinez assigned him new work hours against Alonso's will; and, Alonso stated, "Martinez changed my position from working at AQCB to working in the Central Office." Suppl. CP at 234. Evidence also shows that Martinez managed how employees were to spend their work days on certain

projects; and he controlled overtime and placement on out-of-town projects. Under *Robel*, because Martinez had authority to affect employees' hours, wages (at least in the context of who could earn overtime), and working conditions, he qualified as a manager, at least for summary judgment purposes. *See* 148 Wn.2d at 48 n.5. Alonso produced evidence that Martinez personally participated in some of the harassment, using "Spics" to describe Mexicans, CP at 115, and characterizing Alonso as "not a real Mexican," CP at 114, and not speaking good English; thus, Alonso has demonstrated that the harassment is imputable to Qwest through Martinez. *See Glasgow*, 103 Wn.2d at 407. Viewing the evidence in a light most favorable to Alonso, we hold that he has established a prima facie hostile work environment claim and, thus, the superior court erred in granting Qwest's summary judgment motion on this issue.

## III. RETALIATION

Finally, Alonso contends that Martinez unlawfully retaliated against him because (1) Alonso engaged in statutorily protected activity by reporting discrimination to the Qwest hotline; (2) Qwest engaged in conduct tending to deter discrimination victims from coming forward, an adverse employment action; and (3) the close temporal proximity between Alonso's complaint and further mistreatment demonstrates causation. Here, Alonso failed to sufficiently establish a prima facie retaliation case because he did not demonstrate that he phoned the hotline to report discrimination based on his protected statuses.[14] Therefore, the trial court did not err in dismissing his retaliation claim.

---

[14] Instead, Alonso called to complain about corruption, "vulgar conversation," and mistreatment in the form of heightened scrutiny and being singled out, without connecting these actions to a protected status. CP at 81.

17

The WLAD prohibits retaliation against a party asserting a claim based on a perceived violation of his civil rights or participating in an investigation into alleged workplace discrimination. RCW 49.60.210. To establish a prima facie retaliation case, a plaintiff must show that (1) he engaged in statutorily protected activity, (2) his employer took an adverse employment action against him, and (3) there is a causal link between the activity and the adverse action. *Short v. Battle Ground Sch. Dist.*, 169 Wn. App. 188, 205, 279 P.3d 902 (2012).

We must first determine whether Alonso produced sufficient evidence that he engaged in statutorily protected activity that led to the retaliation.

An employee engages in WLAD-protected activity when he opposes employment practices forbidden by antidiscrimination law or other practices that he reasonably believed to be discriminatory. *Short*, 169 Wn. App. at 205. A general complaint about an employer's unfair conduct does not rise to the level of protected activity in a discrimination action under WLAD absent some reference to the plaintiff's protected status. *See Graves v. Dep't of Game*, 76 Wn. App. 705, 712, 887 P.2d 424 (1994) (affirming lower court's grant of summary judgment on the plaintiff's retaliation claim because the complaints "were not of sexual discrimination").

Here, Alonso argues that he called the Qwest hotline to complain of discriminatory activity motivated by his statutorily protected statuses. But according to the record, Alonso called the hotline to report Martinez and Zuniga for corruption, mistreatment, and vulgar language. Alonso did not express to the hotline that these complaints were in response to harassment based on any protected status.[15]

---

[15] Qwest's redacted hotline reports do not indicate that Alonso claimed he was being discriminated against on account of his religious beliefs and values.

Because Alonso did not phone the hotline to report discrimination against him based on any protected status, he did not establish a prima facie case under WLAD, and we need not consider the remaining elements of a prima facie retaliation claim. Accordingly, we hold that the superior court did not err in dismissing Alonso's retaliation claim.

We reverse the trial court's dismissal of Alonso's disparate treatment and hostile work environment claims, and we affirm the trial court's dismissal of his unlawful retaliation claim.

Johanson, J.

We concur:

Hunt, J.

Worswick, C.J.