# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| JON WILCOX, | No.  57125-1-II |
| Appellant, | |
| v. | |
| | UNPUBLISHED OPINION |
| TUMWATER SCHOOL DISTRICT, a public corporation, | |
| Respondent. | |

PRICE, J. — Former Tumwater Middle School principal, John Wilcox, appeals the superior court's order granting summary judgment in favor of Tumwater School District (TSD), dismissing all of his claims related to his departure from the school at the end of the 2019-2020 school year. Wilcox had asserted claims for (1) disparate treatment, based on age and perceived disability, in violation of the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW; (2) retaliation; (3) hostile work environment; (4) constructive discharge; (5) wrongful discharge in violation of public policy; (6) breach of implied contract based on an employee handbook; and (7) negligent supervision and retention.

We reverse the trial court's dismissal of Wilcox's claims for disparate treatment and retaliation.  We affirm the dismissal of Wilcox's other claims.

No. 57125-1-II

FACTS

I. BACKGROUND

For 18 years, Wilcox was the principal of Tumwater Middle School. In 2019 and 2020, a series of events led to Wilcox submitting his resignation and being placed on administrative leave. The facts of this case are highly disputed. But because we view the facts in the light most favorable to the nonmoving party when reviewing summary judgment, we recount the facts as asserted by Wilcox.[1]

A. WILCOX'S RELATIONSHIP WITH ASSISTANT PRINCIPAL

Wilcox had a longstanding, difficult relationship with his assistant principal, Nick Reykdal. Reykdal was generally not receptive to mentorship and was often absent from school more than was appropriate. He regularly "subverted [Wilcox's] authority by refusing to follow [his] directives[,] creat[ing] new initiatives on his own without [Wilcox's] . . . approval," and frequently arguing with Wilcox. Clerk's Papers (CP) at 245. Ultimately, Reykdal made accusations, including to TSD superintendents, about Wilcox's fitness to be principal.

B. WILCOX ASKED REPEATEDLY ABOUT RETIREMENT PLANS

In 2019, TSD hired a new superintendent, Sean Dotson. During one meeting in fall of 2019, Dotson repeatedly asked Wilcox when he would be retiring and Wilcox said he did not intend to retire.

---

[1] *See Sartin v. Est. of McPike*, 15 Wn. App. 2d 163, 172, 475 P.3d 522 (2020), *review denied*, 196 Wn.2d 1046 (2021) ("We review all evidence and reasonable inferences in the light most favorable to the nonmoving party."). We acknowledge that TSD disputes the facts presented by Wilcox.

2

Later in 2019, Reykdal also asked Wilcox when he was going to retire. Wilcox responded that he might retire in 2021, but did not have a plan at the time. In fall of 2019, Reykdal told Wilcox he had met multiple times with Dotson, sharing his plans to become principal, and eventually superintendent. Following Reykdal's questioning about Wilcox's potential retirement, Reykdal's defiant behavior toward Wilcox escalated.

C.  REYKDAL'S PERFORMANCE IMPROVEMENT PLAN MEETING

In February 2020, due to ongoing issues with Reykdal's behavior and performance, a meeting was planned with Wilcox, Reykdal, and Beth Scouller, the executive director of human resources for TSD. Scouller told Wilcox that Dotson asked her to mediate the conversation, but she claimed she could not serve as a mediator because she did not like Reykdal. As a result, Scouller suggested to Wilcox that they, instead, resolve issues with Reykdal through a performance improvement plan (PIP). Scouller and Wilcox jointly met with Reykdal on February 4 and presented him with the PIP.

D.  EARLY FEBRUARY MEETINGS BETWEEN DOTSON AND WILCOX

Two days later, on February 6, Wilcox left the school premises during the lunch hour. When he returned, Wilcox had received an email from Dotson inviting him to a meeting. The February 6 Dotson email stated Wilcox had not been present for a meeting scheduled for that day during the lunch hour. But no meeting had been planned. The email scheduled a meeting for the following day and stated that Dotson wanted to discuss "a student discipline issue and clarify attendance at leadership meetings."[2]  CP at 248.

---

[2] The suggestion from the email was that Wilcox has missed leadership meetings, but Wilcox claims he had not missed any such meetings.

Wilcox and Dotson met on February 7. Wilcox believed the meeting would be about concerns Wilcox had previously shared about Reykdal or topics Dotson had identified in his February 6 email. Instead, Dotson confronted Wilcox with a report he said he received that made him concerned about Wilcox's health. Dotson directed Wilcox to take a week of medical leave and see a doctor. Wilcox asked what was in the report and who made it, but Dotson refused to provide any details. Wilcox denied he had any medical issues, but Dotson threatened him with administrative leave if he did not take a week of medical leave. Because of Dotson's threat, Wilcox agreed to take the medical leave.

Wilcox's one-week medical leave began the following Monday. The tension from the February 7 meeting aggravated Wilcox's anxiety, which led him to seek medical care while on leave. Wilcox was also contacted by staff members concerned for his health. Wilcox learned that Scouller had sent out a staff-wide email informing the school of his medical leave. While on leave, Dotson called Wilcox at home and advised him that they would meet with Reykdal when Wilcox returned.

E. WILCOX'S RETURN TO TUMWATER MIDDLE SCHOOL

Wilcox returned to work on February 19. As Wilcox approached the scheduled meeting with Dotson and Reykdal, Wilcox realized that Dotson and Reykdal had already been meeting without him. When Wilcox entered the meeting, Reykdal proceeded to "berate" him, while Dotson silently sat back. CP at 250. Dotson then demanded that Wilcox get along with Reykdal and revoked the PIP that Wilcox and Scouller had previously presented to Reykdal.

4

F. FEBRUARY 26 MEETING BETWEEN DOTSON AND WILCOX

Another meeting occurred on February 26 when Wilcox was called into Dotson's office. Dotson said he believed Wilcox had dementia and was thinking of placing Wilcox on administrative leave. Wilcox was startled and accused Dotson of harassing and discriminating against him. Dotson appeared shaken and called Scouller into the meeting. Scouller briefly met privately with Wilcox and asked him whether he wanted to finish the year or would rather immediately leave his job. Wilcox was confused, responding that of course he wanted to finish the year. When Scouller told Dotson that Wilcox wanted to finish the year, Dotson was not pleased. Dotson reiterated that Wilcox was not fit to serve as principal because he had dementia. Dotson again threatened Wilcox with administrative leave. Wilcox then offered the suggestion that perhaps the school staff could be interviewed about Dotson's concerns. Dotson responded that he would think about it but that maybe an examination would be necessary to see if Wilcox was competent.

G. FEBRUARY 27 EVENTS

The next day, on February 27, Dotson called Wilcox into his office again. In Dotson's office, Wilcox was again threatened with administrative leave in a heated discussion. Dotson stated that either Wilcox was "good to go," or Dotson would contact TSD's attorney. CP at 253. Wilcox believed that Dotson and Scouller would not stop until Wilcox resigned, so he stated he was "ready to go." CP at 253. Dotson responded, "I'm not sure you ARE ready!" CP at 253. Later that day, Wilcox emailed Scouller his resignation, effective at the end of the school year.

H. MARCH MEETINGS WITH TUMWATER MIDDLE SCHOOL STAFF

In early March, Scouller undertook staff interviews about Wilcox. She first came to the school to speak with two teachers, DJ Brimer and Renee Cruickshank. Cruickshank later told Wilcox that she felt "set[ ]up" by Scouller's pointed questions about Wilcox. CP at 254. Staff were led to believe something was wrong with Wilcox's health, but Cruickshank, as a union representative, was unaware of any complaints about Wilcox. When Scouller later conducted the additional staff interviews, not only did the staff speak positively about Wilcox, but they actually complained about the behavior of Reykdal.[3]

I. MARCH 10 EVENTS—WILCOX PUT ON ADMINISTRATIVE LEAVE

Meanwhile, the relationship between Wilcox and Reykdal continued to be troubled. By March 10, Wilcox decided he needed to remove the responsibility for teacher evaluations from Reykdal. Reykdal had previously been late with the evaluations, and Wilcox determined he needed to do them instead to ensure compliance with strict state timelines. Wilcox requested the evaluation materials from Reykdal, but he repeatedly refused to hand them over, stating he did not have to do what Wilcox said.

Later that day, Wilcox received a call from Scouller. Wilcox answered the phone on speaker, fearing continued accusations and threats. Scouller requested a meeting with Wilcox and Dotson, but Wilcox stated that he wanted a representative from the Association of Washington State Principals with him and would need time to acquire one.

---

[3] Wilcox submitted declarations from multiple teachers and staff members. The declarations generally stated that Wilcox was a good principal and the staff members were not concerned about Wilcox's cognitive health.

Less than an hour later, Dotson arrived at the school with a letter placing Wilcox on administrative leave, citing reports of Wilcox's alleged refusal to meet with Dotson and Scouller, as well as Wilcox's retaliatory behavior towards a colleague. Dotson's letter stated, in part:

> Although no final decision has been made about next steps, [Tumwater Middle School] needs a safe environment while I engage in fact-finding and make decisions. At this time, you are hereby relieved of your duties and placed on paid administrative leave, pending further investigation of the reports.

CP at 293. The letter also conveyed the seriousness of the action, stating that "the District knows that being placed on administrative leave is a tense and stressful event[.]" CP at 293.

J. EVENTS AFTER WILCOX PLACED ON ADMINISTRATIVE LEAVE

Three days after Wilcox was placed on administrative leave, all school staff went home on paid home assignment due to the COVID-19 pandemic. No investigation about Wilcox's alleged conduct occurred. Wilcox later learned that Reykdal was the original source of the allegations of dementia, but not until he received records as a result of discovery and a public records request.

II. PROCEDURAL HISTORY

Based on the above facts, Wilcox alleged the following claims against TSD: (1) disparate treatment (two claims, based on age and perceived disability), (2) retaliation, (3) hostile work environment (two claims, based on age and perceived disability), (4) constructive discharge, (5) wrongful discharge in violation of public policy, (6) breach of implied contract based on an employee handbook,[4] and (7) negligent supervision and retention.

---

[4] In addition to the facts set forth above, at all times relevant to his claims, TSD had an anti-discrimination policy in place in its employee handbook. And Wilcox and TSD executed one-year employment contracts for each school year Wilcox was employed, including 2019-2020.

TSD moved for summary judgment, requesting dismissal of all claims. Following oral argument, the superior court granted the motion for summary judgment and dismissed all of Wilcox's claims with prejudice.

Wilcox appeals.

## ANALYSIS

Wilcox argues that the trial court erred in granting summary judgment because genuine issues of material fact exist for all of his claims. We hold that genuine issues of material fact prevent summary judgment on Wilcox's disparate treatment claims and retaliation claim and reverse the superior court on those claims. We otherwise affirm the superior court.

## I. LEGAL PRINCIPLES

We review summary judgment orders de novo. *W.M. v. State*, 19 Wn. App. 2d 608, 621, 498 P.3d 48 (2021), *review denied*, 527 P.3d 1141 (2022). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c). A genuine issue of material facts exists if reasonable minds could disagree on the conclusion of a factual issue that controls the outcome of the litigation. *Sartin v. Est. of McPike*, 15 Wn. App. 2d 163, 172, 475 P.3d 522 (2020), *review denied*, 196 Wn.2d 1046 (2021). We review all facts and reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Id.*

"The party moving for summary judgment bears the initial burden to show there is no genuine issue of material fact." *Id.* If a moving defendant shows that there is an absence of evidence to support the plaintiff's case, then the burden shifts to the plaintiff to present specific facts that reveal a genuine issue of material fact. *Id.* "Summary judgment is appropriate if a

plaintiff fails to show sufficient evidence that creates a question of fact about an essential element on which he or she will have the burden of proof at trial." *Id.*

II.  DISPARATE TREATMENT

Wilcox argues that his disparate treatment claims should not have been dismissed because there are genuine issues of material fact that his age and perceived dementia were the reasons for him being placed on administrative leave.  TSD argues that Wilcox's disparate treatment claims fail because Wilcox did not suffer an adverse employment action and because Wilcox cannot show evidence of discriminatory intent.  We agree with Wilcox.

A.  LEGAL PRINCIPLES

Claims for disparate treatment may be brought under the WLAD.  *See, e.g., Johnson v. Chevron U.S.A., Inc.*, 159 Wn. App. 18, 27, 244 P.3d 438 (2010) (stating the WLAD "gives rise to a cause of action for . . . disparate treatment"), *review denied*, 171 Wn.2d 1020 (2011). Discrimination based on both age and perceived disability are prohibited by the WLAD.  RCW 49.60.180(3); *Clipse v. Commercial Driver Servs., Inc.*, 189 Wn. App. 776, 794, 358 P.3d 464 (2015) (claims for disability discrimination may be brought based on a perceived disability).

To establish a prima facie case of disparate treatment, Wilcox must show (1) he was a member of a protected class, (2) he was qualified or doing satisfactory work, (3) he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances that support a reasonable inference of unlawful discrimination.  *Marin v. King County*, 194 Wn. App. 795, 808-09, 378 P.3d 203, *review denied*, 186 Wn.2d 1028 (2016).

In employment discrimination cases, summary judgment in favor of the employer is seldom appropriate because of the difficulty for employees to show discriminatory motives. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 445, 334 P.3d 541 (2014).

### B. ADVERSE EMPLOYMENT ACTION

Wilcox claims there are material issues of fact that should have prevented dismissal of his disparate treatment claims.[5] In response, TSD first challenges these claims based on the absence of an adverse employment action.[6]

An adverse employment action is " 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' " *Marin*, 194 Wn. App at 808 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)). "An actionable adverse employment action must involve a change in employment conditions that is more than an 'inconvenience or alteration of job responsibilities.' " *Kirby v. City of Tacoma*, 124 Wn. App. 454, 465, 98 P.3d 827 (2004) (quoting *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir.1995)), *review denied*, 154 Wn.2d 1007 (2005).

---

[5] As an initial matter, Wilcox asserts two disparate treatment claims, both based on the accusations of dementia—age and disability discrimination. At oral argument, not only did Wilcox confirm he relies on the same evidence for each claim, he identified no distinction between them in the context of his allegations. With no articulated distinction and because the evidence is the same, we consider Wilcox's claims as being principally based on disability discrimination, albeit age based.

[6] TSD does not argue that Wilcox fails to meet the first two elements for his disparate treatment claims, namely that he was a member of a protected class and he was qualified or doing satisfactory work; we therefore do not address whether TSD shows a lack of genuine issues of material fact for those elements.

Neither party cites Washington law addressing the specific question,[7] but it follows that placement on administrative leave could be an adverse employment action if it constitutes " 'a significant change in employment status,' " *Marin,* 194 Wn. App. at 808 (quoting *Burlington*, 524 U.S. 761), and is more than an " 'inconvenience or alteration of job responsibilities.' " *Kirby*, 124 Wn. App. at 465 (quoting *DeGuiseppe*, 68 F.3d at 192).

Here, Wilcox asserts he was threatened with administrative leave and was then actually placed on administrative leave.[8] And this leave had the character of a significant change in employment status—Wilcox was never able to return to his position before the end of the school year. While Dotson's letter said this leave was to be temporary and pending an investigation of Wilcox's behaviors, TSD never conducted an investigation.

Moreover, TSD acknowledged that being placed on administrative leave was not a mere inconvenience. Dotson's letter stated,

> [T]he District knows that being placed on administrative leave is a tense and stressful event . . . .

CP at 293.

Because Wilcox was effectively removed from his position for over two and a half months without any investigation to potentially permit his return, we conclude there are genuine issues of

---

[7] TSD cites federal cases to argue that being placed on administrative leave is not generally an adverse employment action.

[8] TSD requests that some statements from Wilcox's declaration supporting his facts should be stricken, arguing that his declaration was inconsistent with prior deposition testimony. Wilcox responds that his declaration is not inconsistent; it just provided more information about the events he previously described during his deposition. Having compared Wilcox's deposition and his declaration, we conclude the differences do not arise to the level required for exclusion of the declaration.

material fact as to whether this administrative leave constituted an adverse employment action for the purposes of a disparate treatment claim. *See Boyd v. State*, 187 Wn. App. 1, 13-14, 349 P.3d 864 (2015) (whether something constitutes an adverse employment action is a question of fact typically appropriate for the jury).

### C.  DIRECT EVIDENCE OF DISCRIMINATORY INTENT

Having concluded that there are issues of material fact as to whether the administrative leave is an adverse employment action, we next address whether Wilcox can sufficiently show that the adverse employment action occurred under circumstances that support a reasonable inference of unlawful discrimination. Wilcox contends he has presented direct evidence of discriminatory intent sufficient to avoid summary judgment with Dotson's accusations of dementia and threats of administrative leave. TSD responds that Dotson had reasonable, nondiscriminatory reasons to put Wilcox on administrative leave as set forth in the letter itself. We agree with Wilcox.

A plaintiff may establish a prima facie disparate treatment discrimination case by offering direct evidence of an employer's discriminatory intent. *Alonso v. Qwest Commc'ns Co., LLC*, 178 Wn. App. 734, 743, 315 P.3d 610 (2013).[9] "Under the direct evidence test, a plaintiff can establish a prima facie case by providing direct evidence that (1) the defendant employer acted with a discriminatory motive and (2) the discriminatory motivation was a significant or substantial factor in an employment decision." *Id.* at 744. "We generally consider an employer's discriminatory remarks to be direct evidence of discrimination." *Id.*

---

[9] Without direct evidence of discriminatory intent, a plaintiff may satisfy their burden through the use of the *McDonnell Douglas* burden shifting test that establishes an inference of discriminatory intent. *Scrivener v. Clark Coll*, 181 Wn.2d 439, 445, 334 P.3d 541 (2014).

Here, Wilcox attempts to meet this burden with his evidence that Dotson expressed concern for his mental capacity, including accusing him of having dementia, in conjunction with repeatedly threatening to place, and ultimately placing, Wilcox on administrative leave.

Wilcox claims Dotson acted with this intent the first time on February 7, when Dotson stated that he was concerned for Wilcox's health and threatened Wilcox with administrative leave if he did not take a full week of medical leave. The second time was on February 26, when Wilcox contends Dotson accused him of having dementia and considered placing Wilcox on administrative leave as a result. The third time was on February 27, when Dotson threatened administrative leave if Wilcox did not retire by the end of the school year. And finally, only a few weeks later, Dotson actually placed Wilcox on administrative leave and failed to conduct any investigation that could have permitted his return. Wilcox also provided evidence that Reykdal and Dotson communicated about Wilcox's mental capacity on multiple occasions.

Despite TSD's assertions that the administrative leave was imposed for reasons unrelated to Wilcox's alleged dementia, Dotson's accusations of dementia were directly coupled with the threat of administrative leave. This linkage provides evidence that Dotson acted with a discriminatory motive based on the perception of Wilcox having dementia. Wilcox meets his obligation of a prima facia showing that TSD acted with discriminatory motive.

Additionally, Wilcox has provided evidence that the discrimination was a substantial factor for his placement on administrative leave. These multiple instances of Dotson linking a threat of administrative leave with allegations of Wilcox's mental capabilities show that Dotson's accusation of Wilcox having dementia was a substantial factor for Wilcox's eventual placement on administrative leave. And this determination is buttressed by the short interval between

13

Dotson's accusations and the imposition of administrative leave—Wilcox was placed on administrative leave less than two weeks after the late February meetings with Dotson.

Ultimately, our Supreme Court instructs that summary judgment in favor of the employer is seldom appropriate for employment discrimination cases. *Scrivener v. Clark Coll*, 181 Wn.2d 439, 445, 334 P.3d 541 (2014). With this in mind and when the facts are viewed in a light most favorable to Wilcox, Dotson's statements accusing Wilcox of having dementia show both discriminatory motive and that discrimination was a substantial factor for Wilcox's placement on administrative leave. Thus, Wilcox has provided direct evidence of discrimination sufficient to prevent dismissal on summary judgment. *See Alonso*, 178 Wn. App. at 744 ("We generally consider an employer's discriminatory remarks to be direct evidence of discrimination.").

We reverse summary judgment dismissing Wilcox's disparate treatment claims.

III. RETALIATION

Wilcox next argues that after he accused Dotson of harassing and discriminating against him, Dotson retaliated by placing him on administrative leave. TSD argues that Wilcox's claim fails because he cannot show he suffered an adverse employment action as a result of any protected activity. We agree with Wilcox.

To establish a prima facie case of retaliation, Wilcox must show "(1) [he] took a statutorily protected action, (2) [he] suffered an adverse employment action, and (3) a causal link between the employee's protected activity and the adverse employment action." *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 411, 430 P.3d 229 (2018).

Here, Wilcox must first show he suffered an adverse employment action. As explained above, we have already determined there is a genuine issue of material fact about whether Wilcox's placement on administrative leave was an adverse employment action.

Next, Wilcox must show there is a genuine issue of material fact about whether his accusing Dotson of discrimination and harassment resulted in his placement on administrative leave. We conclude Wilcox has made this showing.

Wilcox accused Dotson of discrimination on February 26. Dotson threatened Wilcox with administrative leave during that meeting. The next day, on February 27, Wilcox and Dotson met again, and Dotson again became agitated and threatened Wilcox with administrative leave. According to Wilcox, the threats during this meeting caused him to give his notice of resignation earlier than he planned. But acrimony with Dotson continued, finally hitting a boiling point on March 10 when, after further hostile interactions, Wilcox was placed on administrative leave.

It is plausible that a jury could conclude that the escalation of the hostilities and the ultimate decision to place Wilcox on administrative leave was connected to Wilcox's accusations of discrimination. Therefore, we conclude there is a genuine issue of material fact about whether Wilcox's accusations resulted in his administrative leave. Accordingly, we reverse summary judgment dismissing Wilcox's retaliation claim.

IV. HOSTILE WORK ENVIRONMENT

TSD argues that Wilcox's hostile work environment claims fail because Wilcox has not shown that Dotson's conduct constituted harassment that rises to the level of creating a hostile work environment. We agree.

To establish a prima facie case of discrimination resulting from a hostile work environment, Wilcox must show: " '(1) the harassment was unwelcome, (2) the harassment was because [plaintiff was a member of a protected class], (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer.' " *Loeffelholz v. Univ. of Wash.*, 175 Wn.2d 264, 275, 285 P.3d 854 (2012) (alterations in original) (quoting *Antonius v. King County*, 153 Wn.2d 256, 261, 103 P.3d 729 (2004)).

To satisfy the requirement that the harassment affected the terms and conditions of employment, the harassment "must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Glasgow v Georgia-Pac. Corp.*, 103 Wn.2d 401, 406, 693 P.2d 708 (1985). "Casual, isolated or trivial manifestations of a discriminatory environment do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law." *Id*. Whether the conduct only involved words, or whether the subject was physically intimidated or humiliated may also be examined. *Adams v. Able Bdlg. Supply, Inc.*, 114 Wn. App. 291, 296-97, 57 P.3d 280 (2002). And the conduct must be both objectively and subjectively abusive. *Id.* at 297.

Here, Wilcox argues that several incidents contributed to the hostile work environment, including Dotson's comments about Wilcox having dementia, Dotson threatening to place Wilcox on administrative leave, and Dotson forcing Wilcox to take a week of medical leave. Wilcox additionally argues that Scouller's email to school staff undermined his staff's confidence in his leadership and that Dotson's revocation of Reykdal's PIP prevented Wilcox from overseeing his assistant principal, altering the conditions of his employment.

However, Wilcox must show that Dotson's statements were pervasive, such that they created an abusive working environment prior to his resignation. *Glasgow*, 103 Wn.2d at 406. This, Wilcox cannot do.

Even viewed in a light most favorable to Wilcox, the entirety of the events leading up to his departure were not sufficiently pervasive enough to constitute a hostile work environment. Dotson's discussion of Wilcox's mental capabilities, threats of administrative leave, and the week-long medical leave stem from three occasions when Dotson and Wilcox met. Perhaps the various events can be characterized as indicative of a discriminatory environment or retaliation, but under these specific circumstances, they were too few to be fairly characterized as pervasively creating an abusive working environment sufficient to violate the law on this type of claim.

And the same problems exist for Scouller's email and Dotson's revocation of Reykdal's PIP. These instances, even coupled with the facts above, do not rise to the level of creating an abusive work environment. Wilcox merely asserted that Scouller's email to school staff informed them that Wilcox was on medical leave, which was technically true, even if the leave was forced on Wilcox. The email to the staff did not specify the details of Wilcox's leave or accuse Wilcox of having any specific medical problems and, therefore, cannot be reasonably construed as humiliating to the degree required to show a hostile work environment. Lastly, Dotson's revocation of Reykdal's PIP cannot be said to have altered Wilcox's conditions of employment to a level that created a hostile work environment.

We affirm summary judgment dismissing Wilcox's hostile work environment claims.

V.  CONSTRUCTIVE DISCHARGE

TSD argues that Wilcox's constructive discharge claim fails because Wilcox fails to show that a reasonable person would have been compelled to resign under the same conditions.  We agree.

Constructive discharge occurs when "(1) the employer deliberately made working conditions intolerable, (2) a reasonable person in the employee's position would be forced to resign, (3) the employee resigned because of the intolerable condition and not for any other reason, and (4) the employee suffered damages as a result of being forced to resign."  *Peiffer v. Pro-Cut Concrete Cutting & Breaking Inc.*, 6 Wn. App. 2d 803, 829, 431 P.3d 1018 (2018), *review denied*, 193 Wn.2d 1006 (2019).  We ask whether " 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' "  *Washington v. Boeing Co.*, 105 Wn. App. 1, 15-16, 19 P.3d 1041 (2000) (internal quotation marks omitted) (quoting *Sneed v. Barna*, 80 Wn. App. 843, 849, 912 P.2d 1035 (1996)).

Wilcox asserts several events created intolerable working conditions that resulted in his forced resignation on February 27.  First, on February 7, Dotson instructed Wilcox to take a week of medical leave or face being put on administrative leave.  Second, on February 26, Dotson conveyed to Wilcox that he believed he had dementia and was considering placing Wilcox on administrative leave.  Third, on February 27, the date of Wilcox's resignation, Dotson again threatened placing Wilcox on administrative leave if he did not resign by the end of the school year.  Wilcox also asserts that his staff were misled to believe he had cognitive issues, undermining the staff's confidence in his leadership, and he was stripped of his job duty to supervise his "insubordinate" assistant principle, Reykdal.  Br. of Appellant at 37.

18

Even viewing these facts in a light most favorable to Wilcox, they fall short of creating an issue of fact on constructive discharge. While Dotson's statements conveying that he believed Wilcox was experiencing health issues and threatening to put Wilcox on administrative leave may have been unpleasant, those instances do not rise to the level of Wilcox's working conditions being intolerable. Regarding his staff's confidence in his leadership, Wilcox does not identify specific instances that contributed to his belief.[10] And the revocation of Reykdal's PIP, which limited Wilcox's ability to oversee Reykdal, does not show that Wilcox was stripped of his job duties to a degree that would have been intolerable to a reasonable person. We affirm summary judgment dismissing Wilcox's constructive discharge claim.

VI. WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

TSD argues that Wilcox's wrongful discharge claim fails because Wilcox was never discharged from his position as principal. We agree.

To establish a claim for wrongful discharge in violation of public policy, Wilcox must show (1) the existence of a clear public policy, (2) discouraging the conduct in which they engaged would jeopardize the public policy, (3) the public-policy-linked conduct caused the discharge, and (4) the defendant is unable to offer an overriding justification for the discharge. *Roe v. TeleTech Customer Care Mgmt. (Colorado) LLC,* 171 Wn.2d 736, 756, 257 P.3d 586 (2011).

---

[10] Wilcox actually claims his staff provided Scouller with positive feedback about him; in fact, Wilcox submitted multiple declarations from staff members expressing support for his Wilcox's cognitive abilities. Instead of showing his staff questioned his cognitive abilities and leadership, the submitted evidence demonstrates the school's staff remained confident in Wilcox's ability and leadership.

Here, Wilcox fails to show the underlying requirement of a wrongful discharge claim—that Wilcox was actually or constructively discharged. First, Wilcox does not allege he was actually discharged. Second, as explained above, Wilcox's claim for constructive discharge fails. Therefore, we affirm summary judgment dismissing Wilcox's wrongful discharge claim in violation of public policy.

VII. IMPLIED BREACH OF CONTRACT

TSD next argues that Wilcox cannot assert a claim for an implied breach of contract when Wilcox had an employment contract with TSD. We agree.

An implied breach of contract claim may exist for an at-will employee based on the employer's policies. *Thompson v. St. Regis Paper Co*., 102 Wn.2d 219, 229, 233, 685 P.2d 1081 (1984). Implied breach of contract is a claim that may be asserted as an exception to the employer's ability to terminate at-will employees for any reason. *See id.* "This rule rests on the principle that by using a manual or handbook, an employer secures promises from the employees which create a loyal, orderly and cooperative work force, such that the employer should be equally bound to its promises to the employee which are designed to create an atmosphere of job security and fair treatment." *Drobny v. Boeing Co.*, 80 Wn. App. 97, 101, 907 P.2d 299 (1995).

Wilcox was not an at-will employee. Wilcox had a one-year contract for his employment with TSD for the 2019-2020 school year. Because he was not an at-will employee, he cannot assert an implied breach of contract claim against TSD. We affirm summary judgment dismissing this claim.

VIII. NEGLIGENT RETENTION AND SUPERVISION

Finally, TSD argues that Wilcox's negligent retention and supervision claim fails because the claim requires actions outside the scope of employment, which did not occur here. We agree.

"An employer is generally vicariously liable for negligent acts of an employee conducted within the scope of employment." *Gilliam v. Dep't of Soc. & Health Servs.*, 89 Wn. App. 569, 584, 950 P.2d 20, *review denied*, 135 Wn.2d 1015 (1998). "When an employee causes injury by acts beyond the scope of employment, an employer may be liable for negligently supervising the employee." *Id.* at 584-85. "An employer can be liable for negligent . . . retention for failing to exercise ordinary care by . . . retaining an employee known to be unfit." *Evans v. Tacoma Sch. Dist. No. 10*, 195 Wn. App. 25, 46, 380 P.3d 553, *review denied*, 186 Wn.2d 1028 (2016). "[A]n injured party generally cannot assert claims for negligent . . . retention[] [or] supervision . . . of an employee when the employer is vicariously liable for the employee's conduct." *Id.* at 47.

TSD argues Wilcox does not assert any actions of Dotson or Scouller that were beyond the scope of their employment. Wilcox responds that TSD had a duty to protect Wilcox from discrimination, and so Dotson and Scouller's discriminatory acts could not have been in furtherance of TSD's interests and are, therefore, outside the scope of employment.

But during all of the events Wilcox alleges support his claims, Dotson and Scouller were acting within their scope of employment as administrative employees. The job of a superintendent certainly includes overseeing the executive staff of schools within the district and discussing issues with capabilities and behavior, and human resources' personnel would be responsible for helping facilitate those discussions. Therefore, because Dotson and Scouller were acting within the scope

of their employment,[11] we affirm summary judgment dismissing Wilcox's claims for negligent supervision and retention.

## CONCLUSION

We reverse the dismissal of Wilcox's claims for disparate treatment and retaliation. We affirm the dismissal of Wilcox's other claims.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

CRUSER, A.C.J.

MAXA, J.

---

[11] Tacitly acknowledging the challenge of this argument, Wilcox asks for an extension of current law that would allow his claim under these circumstances. But Wilcox offers no persuasive reason to reject previous caselaw that bars claims for negligent supervision and retention when the employees act within their scope of employment.