**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

JUNE 11, 2026

*Signature*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 11, 2026

*Signature*

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| REYNALDO S. VERDUZCO, | ) | No. 103749-0 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | EN BANC |
| | ) | |
| KING COUNTY, WASHINGTON, | ) | |
| | ) | Filed: June 11, 2026 |
| Respondent. | ) | |
| _____ | ) | |

MONTOYA-LEWIS, J.—An employee sued an employer for employment discrimination and retaliation in violation of the Washington Law Against Discrimination (WLAD). RCW 49.60.030(1)(a), .210(1). Both claims require proof the employer took an adverse employment action. Although neither the legislature nor this court has defined an "adverse employment action," the Washington Pattern Jury Instructions (WPI) Committee offers pattern instructions defining the term for each of those claims. In this case, the trial court issued a jury instruction that combined both WPI definitions. The jury found the employer did not discriminate but did retaliate against the employee, and the employer appealed.

The narrow question presented is whether the jury instruction was misleading.

We are not asked whether the WPI definitions state the correct legal standard; the parties assume they do and dispute only whether the court erred by combining those pattern definitions. While the instruction was misleading, the employer fails to demonstrate reversible error because it did not prejudice the employer. We reverse and remand to the Court of Appeals for further proceedings consistent with this decision.

## FACTUAL BACKGROUND

Reynaldo Verduzco has worked for King County Department of Natural Resources and Parks (DNRP) since 1992. In 2018, he was promoted to program manager for the DNRP hazardous waste management program. Verduzco is Latino, and he uses hearing aids.[1]

The events relating to this retaliation claim began when Verduzco raised a concern about bias in a hiring policy. According to Verduzco, his section manager responded by yelling and berating him for delaying the hiring process. Verduzco was stunned and embarrassed: he felt he was being treated like he was "dumb" and

---

[1] While the text of the WLAD references race discrimination, no one disputes it also protects against discrimination based on ethnicity. *See, e.g.*, *State v. Zamora*, 199 Wn.2d 698, 704 n.6, 512 P.3d 512 (2022) (recognizing that "while 'Hispanic' or 'Latinx' identifies a person's ethnicity and not their race, the language of race when discussing these principles [of discriminatory misconduct] includes Hispanic and Latinx persons" (citing *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 214, 137 S. Ct. 855, 197 L. Ed. 2d 107 (2017); *About the Hispanic Population and its Origin*, U.S. CENSUS BUREAU, https://www.census.gov/topics/population/hispanic-origin/about.html [https://perma.cc/435J-8PVB])). Verduzco described himself as Latino, Mexican, and a Person of Color. This opinion uses the terms "race" and "ethnicity" to encompass those identities.

2

"stupid" and his hiring decisions were not being taken seriously because he is Mexican. 12 Verbatim Rep. of Proc. (VRP) at 1461-62.

Verduzco documented that interaction in several e-mails to human resources, DNRP leadership, and members of the People of Color affinity group. He reported that the section manager was retaliating against him for raising concerns about bias and described her behavior as abusive and part of a pattern of racism at DNRP.

Human resources investigated this incident and concluded there had been no discrimination directed at Verduzco because of his race or ethnicity. They told Verduzco he should bring forward any concerns about discrimination or retaliation but warned him about his approach and the tone and quantity of his e-mails. Accordingly, Verduzco received a letter of expectations from his supervisor, directing him to act professionally and follow workplace values of fairness and respect. The letter also warned that continued behavior could lead to progressive discipline up to and including termination.

Several tense meetings took place over the next few months. First, when leading his team meeting, Verduzco shared news about a recent mass shooting in El Paso, Texas. His hazardous waste management team worked closely with Latine-owned businesses in King County, and Verduzco wanted his team to be aware of the shooting—which targeted a Latine community, killing more than 20 people—and how it may be affecting the community they serve. Verduzco noticed that some

3

people left that meeting upset.

A colleague from a different team heard about those negative responses and appeared at Verduzco's next team meeting, wanting to attend. Verduzco was surprised and upset by this because he expected that colleague to speak with him directly before attending one of his team meetings. As a program manager, Verduzco felt undermined in his professional role because he felt, as a Latino in a position of authority, he was being monitored for having an emotional discussion about a racial equity matter with his team. Verduzco brought these concerns to his supervisor, Charles Wu. According to Wu, Verduzco became very angry and yelled. Verduzco said that although the discussion was tense, he did not yell.

The next day, Verduzco and Wu attended a race equity conference for government employees. When asked to discuss barriers to a successful antiracist workplace, Verduzco said management was not supportive of addressing racism. There was significant ambient noise in the room—an echoing gymnasium with many people in groups speaking at once—and Verduzco spoke loudly. He also used profanity. According to Wu, Verduzco yelled at him and expressly named several DNRP leaders as holding back equity work and perpetuating racism at their workplace. Verduzco said he never yelled or directed his comments at anyone. When they returned from the conference, Wu informed Verduzco there would be an investigation into his conduct, and,

4

if his behavior continued, he would "be asked to leave the building." Clerk's Papers (CP) at 2315.

Verduzco then received a parking ticket at the DNRP building parking lot. He e-mailed Wu to report this because he felt he had been targeted for the ticket due to his race and ethnicity. Wu issued Verduzco another letter of expectations regarding his use of county e-mail to "accuse" the parking attendant of racist behavior. *Id.* at 2306-07. The letter directed Verduzco to address personal issues via private e-mail and again warned that further incidents could lead to discipline and termination.

Around the same time, Verduzco received a substandard performance review for the first time. The performance review cited his "inappropriate use of county e-mail." 12 VRP at 1455.

The county placed Verduzco on administrative leave with no definite end date. Verduzco was paid, but he was not permitted in the DNRP offices, the door codes to access the building were changed, and investigations into his conduct and complaints continued. This went on for five months. Ultimately, the county decided to issue a five day suspension without pay as a consequence for Verduzco's "inappropriate" e-mails and behavior. CP at 1679.

After five months' administrative leave and five days' unpaid suspension, Verduzco was permitted to return to work. He was placed in a different role

at DNRP upon his return. Though his job classification and pay did not change, he had less responsibility, and so the reassignment felt like a demotion. Together, the investigations, administrative leave, suspension, and reassignment made Verduzco feel humiliated, anxious, and silenced.

## PROCEDURAL HISTORY

Verduzco sued the county, bringing claims of discrimination based on race, ethnicity, and disability, and a claim of retaliation under the WLAD. The parties proceeded to a jury trial where the jury was instructed as to all claims.

The WPI offers pattern jury instructions for both retaliation and discrimination claims under the WLAD. The pattern instructions suggest different definitions of an "adverse employment action" for each cause of action. In the WPI "retaliation" section, the definitional instruction states:

> The term "adverse" means unfavorable or disadvantageous. An employment action is adverse if it is harmful to the point that it would dissuade a reasonable employee from making a complaint of [discrimination] [harassment] [and] [or] [retaliation]. Whether a particular action is adverse is judged from the perspective of a reasonable person in the plaintiff's position.

6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 330.06, at 250 (7th ed. Supp. 2022) (alterations in original).

For a discrimination claim, the WPI suggests, "An adverse employment action is one that materially affects the terms, conditions or privileges of employment." WPI 330.01.02, at 234.

Verduzco proposed one instruction that recited both definitions from the WPI:

The term "adverse" means unfavorable or disadvantageous. An employment action is adverse if it is harmful to the point that it would dissuade a reasonable employee from making a complaint of discrimination. Whether a particular action is adverse is judged from the perspective of a reasonable person in the Mr. Verduzco's position. An adverse employment action is one that materially affects the terms, conditions, or privileges of employment.

CP at 2542. The county opposed this instruction, arguing the jury "would be confused by this [instruction] and apply it both to the discrimination and retaliation cases." 15 VRP at 1999. The court rejected this argument, concluding Verduzco's proposed instruction did not cause confusion or prevent the county from arguing its case. The court accepted Verduzco's proposed instruction as instruction 8.

In closing arguments, Verduzco contended the county took numerous adverse actions against him: multiple investigations, administrative leave, suspension without pay, and effective demotion. The county, on the other hand, argued the only adverse action was the unpaid suspension. 18 VRP at 2500. It asserted both the discrimination claims and the retaliation claim should fail anyway because the county suspended Verduzco for his "unprofessional conduct," rather than his race, ethnicity, disability, or reasonable opposition to discrimination. *Id.* at 2509-11.

The jury found the county did not discriminate against Verduzco based on his race, ethnicity, or disability. But it found the county did retaliate against him.

The county appealed, assigning error to instruction 8 and several other independent issues. Specifically, it raised the issue of whether the instruction was likely to confuse or mislead the jury regarding the retaliation claim. Verduzco cross-appealed regarding the calculation of attorney fees.

The Court of Appeals reversed. *Verduzco v. King County*, No. 57052-1-II, slip op. at 1 (Wash. Ct. App. July 30, 2024) (unpublished).[2] It concluded that instruction 8 was erroneous and reversed and remanded the retaliation claim for a new trial. *Id.* at 27. The court declined to reach the remaining issues raised by the parties on appeal. *Id.* at 1. We granted review. 4 Wn.3d 1015 (2025).

ANALYSIS

The WLAD recognizes a civil right to be free from discrimination. RCW 49.60.030(1). This civil right encompasses the right to obtain and hold employment without discrimination relating to protected statuses, such as race, ethnicity, or disability. RCW 49.60.030(1)(a), .010. It also prohibits employers from retaliating against someone who opposes acts of discrimination. RCW 49.60.210(1).

Only Verduzco's retaliation claim is at issue here. The WLAD's retaliation provision declares it an unfair practice for an employer "to discharge, expel, or

---

[2] https://www.courts.wa.gov/opinions/pdf/D2%2057052-1-II%20Unpublished%20Opinion.pdf

otherwise discriminate against any person because [they have] opposed any practices forbidden by this chapter." *Id.* A prima facie showing of retaliation requires (1) the employee took a statutorily protected action, (2) they suffered an adverse employment action, and (3) there is a causal link between their protected activity and the adverse employment action. *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 411, 430 P.3d 229 (2018) (citing *Currier v. Northland Servs., Inc.*, 182 Wn. App. 733, 742, 332 P.3d 1006 (2014); *Wilmot v. Kaiser Alum. & Chem. Corp.*, 118 Wn.2d 46, 68, 821 P.2d 18 (1991)).

The county conceded the suspension was an adverse action but argued the other actions were not adverse. 18 VRP at 2500; Opening Br. of Appellant/ Cross-Resp't King County at 44 (Wash. Ct. App. No 57052-1-II (2023)). The parties do not dispute any other element of the retaliation claim. Nor do the parties ask this court to define an adverse action under the WLAD as a matter of law.[3] Our review is limited to the sufficiency of the jury instruction that stated both pattern definitions.

---

[3] The parties assume the WPI accurately states the law, but pattern jury instructions "are not authoritative primary sources of the law" and "do not receive advance approval from any court." 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 0.10, at 2-3 (7th ed. 2019); *State v. Carson*, 184 Wn.2d 207, 224 n.11, 357 P.3d 1064 (2015). In fact, the parties identify no authoritative source of Washington law defining "adverse employment action" in this context. No provision of the WLAD defines an adverse employment action; the term "adverse" does not appear in that statutory scheme at all. *See* RCW 49.60.210(1) ("retaliation" means "to discharge, expel, or otherwise discriminate against"). WPI 330.06 is modeled after a U.S. Supreme Court decision interpreting *federal* antidiscrimination law. WPI 330.06 cmt. (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). Although our Court of Appeals has found *White* persuasive, this court has never considered whether *White*'s interpretation of federal law has any application to the WLAD. *Compare Boyd v. State*, 187 Wn. App. 1, 15, 349 P.3d 864 (2015), *with*

Jury instructions are reviewed de novo for errors of law; absent a legal error, the specific language of instructions are matters of the trial court's discretion. *Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 323, 119 P.3d 825 (2005); *Douglas v. Freeman*, 117 Wn.2d 242, 256, 814 P.2d 1160 (1991). "Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law." *Bodin v. City of Stanwood*, 130 Wn.2d 726, 732, 927 P.2d 240 (1996). A jury instruction is erroneous if any of those elements are absent. *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 860, 281 P.3d 289 (2012). "An erroneous instruction is reversible error only if it prejudices a party. Prejudice is presumed if the instruction contains a clear misstatement of law; prejudice must be demonstrated if the instruction is merely misleading." *Id.* (citation omitted) (citing *Joyce*, 155 Wn.2d at 323; *Keller v. City of Spokane*, 146 Wn.2d 237, 249-50, 44 P.3d 845 (2002)). The county challenged jury instruction

---

*Jin Zhu v. N. Cent. Educ. Serv. Dist.—ESD 171*, 189 Wn.2d 607, 613, 404 P.3d 504 (2017). While Washington courts sometimes regard federal law as persuasive, federal case law is "not binding on this court, which is 'free to adopt those theories and rationale which best further the purposes and mandates of our state statute.'" *Kumar v. Gate Gourmet, Inc.*, 180 Wn.2d 481, 491, 325 P.3d 193 (2014) (quoting *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 361-62, 753 P.2d 517 (1988)). In light of the WLAD's command for liberal construction, RCW 49.60.020, "[w]here this court has departed from federal antidiscrimination statute precedent, . . . it has almost always ruled that the WLAD provides greater employee protections than its federal counterparts." *Id.* We have yet to consider the contours of a retaliatory action under Washington law. Given that the parties here do not ask us to define an adverse action under the WLAD in order to resolve this dispute, we will not reach that question at this time.

10

8 solely on the basis that it was misleading or confusing. Opening Br. of Appellant/Cross-Resp't King County, at 2, 39-40 (Wash. Ct. App. No. 57052-1-II (2023)).

Instruction 8 listed both pattern definitions sequentially, as Verduzco raised both types of claims. The WPI anticipates that a plaintiff might bring both types of claims and recommends courts "combine" the two instructions "to differentiate" the two claims. WPI 330.01.02 note on use, 330.06 note on use. The WPI offers no further guidance on how to do so.[4]

Given that the instructions could have been read as alternatives or as individually required elements, the instruction as given may have been misleading. Assuming—without deciding—that the WPI's construction of the definitions accurately state the law, combining the two WPI definitions into a single instruction, with no further direction, could have misled the jury. As given, the instruction is ambiguous as to how the definition applied to each of Verduzco's claims.

Ambiguity in a jury instruction may be misleading. *Anfinson*, 174 Wn.2d at 874. For example, *Anfinson* involved a jury instruction on representative evidence in a class action for violations of the Washington

---

[4] Nothing prevents the WPI Committee from drafting additional pattern instructions for use in trials where more than one type of claim is present. Further, trial courts could anticipate confusion and clarify by specifying definitions or providing special verdict forms.

Minimum Wage Act. The instruction stated that the jury should not consider individual work experiences unless it finds "'that they reflect policies, procedures, or practices *common* to the class members during the class period.'" *Id.* (emphasis added) (quoting the record). That instruction was "ambiguous because the term 'common' is subject to multiple definitions"—it could mean either shared by *all* members of a group or a characteristic of a *usual* type. *Id.* at 874-75. The instruction could be read to describe work experience that was true for *most* members of the class or experiences shared by *all* members of the class. If the jury read "common" to mean "all," the instruction would effectively prohibit the use of representative evidence otherwise permitted in class actions under wage and hour laws. *Id.* at 875. Though the instruction did not necessarily state an incorrect legal standard, it was ambiguous as to the legal standard and therefore misleading. *See also Lake Hills Invs., LLC v. Rushforth Constr. Co.*, 198 Wn.2d 209, 224, 494 P.3d 410 (2021) (jury instruction that "did not explicitly inform the jury that it could calculate and attribute proportional liability" was potentially misleading).

Similarly here, the adverse employment action instruction was ambiguous as to how it applied to each of Verduzco's claims. The instruction listed both pattern definitions of adverse actions for discrimination and retaliation claims, but did not differentiate between the two claims, as the WPI recommends. WPI 330.01.02 note on use, 330.06 note on use. Without differentiating between the

12

discrimination and retaliation claims, each sentence in the instruction could be read as alternative conceptions of "adverse" or as criteria that must be satisfied comprehensively. This ambiguity was potentially misleading. *See Anfinson*, 174 Wn.2d at 874-76; *Lake Hills*, 198 Wn.2d at 224.

However, the county fails to demonstrate it was prejudiced by this instruction. The county argues that prejudice should be presumed. However, "[i]n order to be reversible, a misleading jury instruction must also be prejudicial. Unlike a clear misstatement of law, prejudice is not presumed." *Anfinson*, 174 Wn.2d at 876 (citation omitted) (citing *Keller*, 146 Wn.2d at 249-50). As the challenging party, the county bears the burden to establish prejudice. *Griffin v. W. RS, Inc.*, 143 Wn.2d 81, 91, 18 P.3d 558 (2001); *Lake Hills*, 198 Wn.2d at 225-26.

Verduzco alleged the county both discriminated and retaliated against him; under the WLAD, discriminating against a person who has opposed an act of discrimination is a type of retaliation. RCW 49.60.210(1). The evidence presented to the jury suggested a pattern of Verduzco complaining and the county responding: Verduzco viewed the county's responses as discriminatory and retaliatory while the county characterized its actions as justified and disciplinary. Although the WPI definitions may differ qualitatively in order to address different harms—treating an employee adversely because of their status or treating them adversely because of their complaint—in practical terms, many actions by employers could

13

fall under both categories. *E.g.*, *Jin Zhu v. N. Cent. Educ. Serv. Dist.—ESD 171*, 189 Wn.2d 607, 615, 404 P.3d 504 (2017) (failure to hire may constitute both discrimination and retaliation). *Compare Alonso v. Qwest Commc'ns Co.*, 178 Wn. App. 734, 747, 315 P.3d 610 (2013) (for a discrimination claim, reassignment with loss of benefits may constitute an adverse action), *with Tyner v. Dep't of Soc. & Health Servs.*, 137 Wn. App. 545, 564-65, 154 P.3d 920 (2007) (for a retaliation claim, reassignment with loss of benefits may constitute an adverse action).

Indeed, some of the same conduct by the county in this case could be relevant to both pattern definitions. Verduzco produced evidence of several actions that might be sufficiently unfavorable or disadvantageous to dissuade a reasonable employee from complaining: DNRP leadership wrote letters in his personnel file, gave him a poor performance review, put him on leave, revoked his access to the building, and suspended him without pay. Those actions individually or collectively might dissuade a reasonable employee in Verduzco's position from complaining, under the WPI definition for a retaliatory adverse action. WPI 330.06; *see Boyd v. State*, 187 Wn. App. 1, 14, 349 P.3d 864 (2015) (finding substantial evidence of adverse actions in a retaliation claim when employer issued a written reprimand, reported employee to the police, and suspended employee without pay). Some of those actions may *also* satisfy the WPI definition

for a discriminatory adverse action. For example, revoking Verduzco's access to the building where he worked affected the terms or conditions of his employment. WPI 330.01.02. Even if not all the actions affected the terms or conditions of Verduzco's employment, *the county does not dispute that the unpaid suspension did*, given that Verduzco was not permitted to work and was not compensated.[5]

The county fails to explain how it was prejudiced by this instruction. Instead, the county contends the jury might have read instruction 8 to find some conduct materially affected the terms or conditions of employment *without considering* whether it could *also* dissuade a reasonable employee from complaining of discrimination. But the county cannot explain why unpaid suspension could not dissuade a reasonable employee in Verduzco's circumstances from complaining.

If anything, combining the two WPI definitions narrowed the scope of actions the jury could consider to only those that satisfied both definitions. Reducing the range of actions to consider did not lower Verduzco's burden; it made it easier for the county to negate the adverse action of the retaliation claim (and harder for Verduzco to prove that element) than the pattern instructions call for. Rather than prejudicing the county, instruction 8 seems to have benefited it. The instruction

---

[5] The county argued no other conduct but the unpaid suspension could constitute "discipline" because a union representative testified that some actions, such as administrative leave, would not be subject to a grievance procedure under the collective bargaining agreement. But the county cites no authority for the proposition that the negotiated terms of a contract between a union and an employer control the meaning of a retaliatory or discriminatory act deemed an unfair practice by the legislature.

15

allowed the county to argue its theory of the case: that the unpaid suspension was the only adverse action it took and that doing so was justified, not retaliatory. The county fails to demonstrate prejudice. *See Lake Hills*, 198 Wn.2d at 225-26.

## CONCLUSION

The narrow question presented is whether a jury instruction that combined two WPI definitions of a term—which has never been defined by the legislature or examined by this court—was misleading to a jury tasked with determining both retaliation and discrimination claims. While instruction 8 was ambiguous to the extent it combined pattern definitions without direction on how to apply them to each of the claims, the county has failed to demonstrate reversible error. This instruction did not prejudice the county. *Id.* at 227 (no reversible error when potentially misleading instruction did not prejudice the challenging party). Given that other appellate issues remain, we reverse and remand to the Court of Appeals to decide the additional issues raised on appeal and decline to assess attorney fees at this time. RAP 13.7(b); RAP 18.1.

_____
Montoya-Lewis, J.

WE CONCUR:

_____
Stephens, C.J.

_____
Johnson, J.

_____
González, J.

_____
Gordon McCloud, J.

_____
Whitener, J.

_____
Mungia, J.

_____
Madsen, J.P.T.

_____
Yu, J.P.T.